Roderick D. WALKER, Amin Habeeb Ul-lah, a/k/a Franklin Neal, Romando Valerosi, Floyd W. Zeros, Ronald E. Thelen, Marvin Mayberry, Donald Sullivan, Dennis Spaulding, John T. Crown, Jerry Gonyea, David Lytal, Lewis Robinson, Timothy Spytma, on behalf of themselves and all others similarly situated, Plaintiffs-Appellees, Cross-Appellants,

v.

Barry MINTZES, Perry Johnson, Dale Foltz, Theodore Koehler, individually and in their official capacities, Defendants-Appellants, Cross-Appellees.

Nos. 82–1865, 82–1913.

United States Court of Appeals, Sixth Circuit.

Argued April 8, 1985.

Decided Aug. 22, 1985.

Rehearing and Rehearing En Banc Denied Oct. 25, 1985.

---

Frank J. Kelley, Atty. Gen. of Michigan, Thomas C. Nelson, Asst. Atty. Gen., Corrections Div. Crim. Appeals Section (argued), Lansing, Mich., for defendants-appellants, cross-appellees.

Larry Bennett, Neal Bush, Judith Magid, Mark Grenzotto (argued), William Goodman, Goodman, Eden, Millender & Bedros, Detroit, Mich., for plaintiffs-appellees, cross-appellants.

Before WELLFORD and MILBURN, Circuit Judges, and KINNEARY,* District Judge.

WELLFORD, Circuit Judge.

Inmates at three separate Michigan correctional facilities, the Marquette Branch Prison ("Marquette"), the State Prison of Southern Michigan at Jackson ("Jackson"), and the Michigan Reformatory at Ionia ("Ionia") instituted this action against prison officials, alleging various violations of their first, eighth and fourteenth amendment rights. The district court agreed with many of the inmates' claims and granted much of their requested relief. *See* 544 F.Supp. 345 (E.D.Mich.1982). Both the inmates and prison officials have appealed the district court's judgment.

Essentially, the inmates' complaints arise from actions taken by prison officials in

---

* Honorable Joseph P. Kinneary, United States District Judge for the Southern District of Ohio, sitting by designation.

response to a series of uprisings that occurred at each of the named prisons. On May 22, 1981, members of the Michigan Corrections Officers Association (the prison guards) attempted to "lock down" inmates at the Jackson facility. This was done against the orders of the prison warden, and precipitated a riot in the Central Complex (a maximum security facility). Likewise, inmates of the Jackson Northside Complex (a medium security facility) joined in the disturbance. On Friday evening, May 22, 1981, rioting spread to Ionia, where the inmates had learned of the Jackson uprising. By the following day, both facilities were secured. On May 25, 1981, rioting once again broke out at the Jackson facility, with burning and looting occurring in both the Northside and Central complexes. The following day the rioting spread to both Ionia and Marquette, resulting in significant property damage to each facility.

By May 27, 1981, the prisons were once again secured. As a result of the riots, however, prison officials at all three prisons were required to implement an emergency lockdown, including drastic reductions in the inmates' privileges. Prison officials were also forced to reconsider the security measures at all three facilities. These actions resulted in a substantial change in general prison policy. Included within the changes were reductions in "yard time" (the amount of outdoor time allowed inmates for recreation and exercise), reductions in the number of showers allowed each inmate per week, restrictions on access to the prison law libraries, restrictions on organized religious services, and reductions in work and recreational programs. Also, inmates at Marquette were no longer allowed to wear clothing when walking to the showers.[1]

The inmates challenge most of these changes under the eighth amendment, as constituting cruel and unusual punishment. Further, they claim that the restrictions on access to organized religious services vio-

late their first amendment rights, and that the restrictions on their library privileges impede their right of access to the courts. Finally, the inmates at the various institutions claim that a new policy implemented in relation to administrative segregation deprives them of liberty without due process of law.

The district court found that prison officials were acting in violation of the eighth amendment by unduly limiting the yard time afforded the inmates. Also, the court concluded that the prison officials were violating the first amendment by restricting organized religious meetings. Further, the court granted part of the inmates requested relief in relation to the alleged due process violations. The court rejected the inmates' claim that the restricted number of showers violated the eighth amendment, at least in two of the three prisons. Finally, the court held that inmates could not be required to walk naked to the showers, as had become the practice at Marquette.

### I. The Eighth Amendment

■ We are first called upon to address the decision of the district court in relation to its various findings of violations of the eighth amendment. The inmates do not challenge the prison officials' decision to initiate lockdowns following the riots. What the inmates challenge is the "new normal" that has been implemented following the lifting of the lockdowns. At the time of trial, prison officials at Jackson and Ionia testified that the emergency had lifted, while officials of Marquette testified that they still considered themselves in the midst of emergency conditions. In all three cases, however, it is undisputed that the officials do not plan again to implement pre-riot policies.

The Supreme Court has addressed prison overcrowding in *Rhodes v. Chapman*, 452 U.S. 337, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981), a suit brought to enjoin prison officials from placing two inmates in each jail

---

**1.** The inmates make numerous charges. We will focus our discussion on those claims found meritorious by the district court.

cell, in which this court affirmed a district court finding that "double celling" violated the eighth amendment. The Supreme Court, however, reversed, finding no eighth amendment violation, and concluding that no "static test" could be employed:

Today the Eighth Amendment prohibits punishments which, although not physically barbarous, "involve the unnecessary and wanton infliction of pain," or one grossly disproportionate to the severity of the crime. Among "unnecessary and wanton" inflictions of pain are those that are "totally without penological justification."

*Id.* at 346, 101 S.Ct. at 2399 (citations omitted).

The *Rhodes* Court concluded that prisoners could not constitutionally be deprived the "minimal civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399. In relation to the facts before it, the Court found that "double celling" was not such a violation. The practice did not deprive prisoners of "essential food, medical care or sanitation." *Id.* at 348, 101 S.Ct. at 2400.[2] The Court emphasized that even though the practice in question was undesirable, this was not grounds for holding the practice unconstitutional:

[We] cannot assume that state legislatures and prison officials are insensitive to the requirements of the Constitution or to the perplexing sociological problems of how best to achieve the goals of the penal function in the criminal justice system: to punish justly, to deter future crime, and to return imprisoned persons to society with an improved chance of being useful, law-abiding citizens.

*Id.* at 352, 101 S.Ct. at 2402. Further, the courts' function is not to decide "how best to operate a detention facility," *id.* at 351, 101 S.Ct. at 2401, especially in light of the fact that "a prison's internal security is peculiarly a matter normally left to the

discretion of prison administrators." *Id.* at 349, n. 14, 101 S.Ct. at 2400, n. 14.

■ The inmates argue that in addressing an eighth amendment claim in a prison condition context, the court must consider the "totality of the circumstances," and order relief accordingly, citing a *Rhodes* statement that prison conditions may violate the eighth amendment, considered either "alone or in combination." *Id.* at 347, 101 S.Ct. at 2399; *see also id.* at 363 n. 10, 101 S.Ct. at 2407 n. 10 (Brennan, J., concurring) ("The Court today adopts the totality-of-the circumstances test"). The inmates urge this court to adopt the approach taken in *Doe v. District of Columbia*, 701 F.2d 948 (D.C.Cir.1983). There, the court expressed the view that even though no specific prison condition contravened the eighth amendment, "exposure to the cumulative effect of prison conditions may subject inmates to cruel and unusual punishment." *Id.* at 957 (citation omitted). Thus, the inmates argue that a court may, under the eighth amendment, order prisons to correct certain conditions even though those conditions in and of themselves are not unconstitutional.

We are unwilling to adopt this *Doe* analysis, and instead interpret *Rhodes* to require consideration of all the prison's conditions and circumstances, rather than isolated conditions and events, when addressing eighth amendment claims. In certain extreme circumstances the totality itself may amount to an eighth amendment violation, but there still must exist a specific condition on which to base the eighth amendment claim. We believe such conditions, "considered alone or in combination [with other conditions]," *Rhodes*, 452 U.S. at 347, 101 S.Ct. at 2399, must amount to a deprivation of "life's necessities," *id.*, before a violation of the eighth amendment can be found.

---

**2.** In regard to an argument that limited work hours and delay in instituting an educational program exacerbated the problem, the Court stated that these "do not inflict pain, much less unnecessary and wanton pain; deprivations of this kind simply are not punishments." *Id.* We

agree with the district court's conclusion in the present case that reductions in work and recreational programs did not violate the eighth amendment. We also agree with the district court that tighter security in the dining halls did not work an eighth amendment violation.

Several circuits concur in this analysis. In *Hoptowit v. Ray*, 682 F.2d 1237, 1246–47 (9th Cir.1982), the court stated:

Courts may not find Eighth Amendment violations based on the "totality of conditions" at a prison. There is no Eighth Amendment violation if each of these basic needs [food, clothing, shelter, sanitation, medical care, and personal safety] is separately met.... A number of conditions, each of which satisfy Eighth Amendment requirements, cannot in combination amount to an Eighth Amendment violation.

*See also Union County Jail Inmates v. DiBuono*, 713 F.2d 984, 999 (3d Cir.1983); *Smith v. Fairman*, 690 F.2d 122, 125 (7th Cir.1982) ("Vague conclusions that the totality of conditions amounts to a constitutional violation, ... are insufficient ... to establish a violation of the eighth amendment"); *Ruiz v. Estelle*, 679 F.2d 1115, 1139–40 n. 98 (5th Cir.1982) ("a generalized and 'vague conclusion' concerning the totality of conditions is insufficient [to establish an eighth amendment violation]"). This approach, moreover, is wholly consistent with this circuit's previous discussion of the matter in *Bellamy v. Bradley*, 729 F.2d 416 (6th Cir.1984).

### A. Yard Time

■ In all three prisons the district court found eighth amendment violations because of the "reduction in yard time." 544 F.Supp. 345. We are first left unclear whether the district court considered the "new normal" to violate the eighth amendment, or whether the act of "reduction" itself was unconstitutional. If the latter, in and of itself, were deemed unconstitutional, it was an erroneous conclusion, because the question is not what yard time the inmates should receive in relation to their previous experience; instead, the question focuses on what minimal constitutional requirements exist in the particular prison setting.

Next, in ordering the various prisons to provide the inmates specific amounts of yard time, the district court chose different times for different prisons, and even for different classifications of prisoners within each prison. At Marquette, for example, the court found that general population prisoners were being given 45 minutes of yard time each day. This was a reduction from the pre-riot allotment of four to five hours per day. Those subject to administrative detention received 40 minutes *per week* yard time, effectively the same as they had received prior to the riot. To correct a perceived constitutional violation in this respect, the court ordered that general population prisoners be given two hours of yard time per day, those in administrative segregation thirty to forty minutes of yard time each *day*. 544 F.Supp. at 360.

Jackson was treated in a different fashion. There, prisoners in Cell Blocks 3, 4, 5, 7, and 8 of the Central Complex were found to receive one hour of yard time each day, a reduction from the pre-riot level of eight hours per day. Inmates in "honor" Cell Blocks 11 and 12, prior to the riot received seven hours of yard time per day, reduced thereafter to four hours of "base"[3] yard time each day. Jackson inmates in administrative segregation were granted only one hour of yard time every eight to eleven days, as opposed to their pre-riot allotment of one half hour per week. The district court ordered that the inmates in Cell Blocks 3, 4, 5, 7, and 8 be given two hours per day yard time. Likewise, of the four hours per day given to the inmates in Cell Blocks 11 and 12, two hours were ordered to be spent outside. Those inmates in administrative segregation were ordered to be given 30 minutes of yard time each *week*.

In the Jackson Northside Complex, the court found both assigned and unassigned inmates received approximately three and one-half hours of yard time per week. Prior to the riot, however, all general population inmates received four hours per day. The court directed unassigned inmates to be given two hours of yard time per day,

---

**3.** This was non-outdoor recreational time.

and assigned inmates at least thirty minutes per day.

Finally, in regard to Ionia, the court found that unassigned inmates were granted 45 minutes of yard time two or three days a week, along with twenty minutes of additional yard time four times per week. Assigned inmates were found to be given yard time only as it became available, a reduction from the pre-riot level of two hours each day. The district court ordered that assigned inmates be given one hour of yard time each day, while the unassigned inmates be given twenty minutes each day.[4]

What the district court concluded the inmates at the various institutions should receive as a constitutionally sufficient amount of yard time thus varied from prison to prison. General population inmates at Marquette and Jackson were ordered to be given a minimum of two hours per day yard time, those at Ionia only one hour each day. On the other hand, assigned inmates at Ionia were ordered to be given one hour per day yard time, more than that ordered for the unassigned inmates, while at the Jackson Northside Complex assigned prisoners were ordered to be given only thirty minutes each day, substantially less than that ordered for unassigned prisoners.

■ The explanation given for variances in yard time ordered for administratively segregated prisoners at the Jackson Central Complex and Marquette, was "differences in circumstances." 544 F.Supp. at 345. Differing circumstances from prison to prison might explain minor differences in constitutionally required yard time, but further explanation is needed to justify differences in minimum yard time directed for inmates housed in the same facility, who may be classified as "assigned" or "unassigned," "general population" or otherwise. At each prison it is apparent that the district court concluded that prisoners with more freedom are constitutionally entitled to additional yard time. Those in adminis-

trative segregation were ordered to be given the least, while those in the general population were ordered to be given the most. We need further explanation or rationale with respect to the bases for these differences at a matter of constitutional need or imperative, taking into account, of course, prison security requirements and conditions.

■ We remind the district court that the function of a federal court in an action challenging prison conditions under the eighth amendment, is not "how best to operate a detention facility," nor to decide what is most desirable for the inmates. *Rhodes*, 452 U.S. at 351, 352, 101 S.Ct. at 2401, 2402. Rather, a court's function under the eighth amendment standards is to determine the *"minimal* civilized measure of life's necessities." *Id.* at 347, 101 S.Ct. at 2399 (emphasis added). In respect, then, to the yard time controversy, the trial court must seek the *minimum* amount of yard time necessary for the inmates' well-being under minimal civilized standards. *See, e.g., Spain v. Procunier*, 600 F.2d 189 (9th Cir.1979).

Finally, we invite the district court to consider whether yard time is constitutionally required in relation to the other types of restrictions placed on the inmates. In *Hoptowit*, 682 F.2d at 1247, the court noted that there might be an eighth amendment violation in a case where an inmate is isolated and is deprived of "nearly all fresh air and light." In *Spain v. Procunier*, 600 F.2d at 199, the court refused to adopt a *per se* rule that "deprivation of outdoor exercise is a ... violation of the eighth amendment." Instead, the court recognized only that "some form of regular outdoor exercise is extremely important to the psychological and physical well being of the inmates," *id.*, and held that where certain inmates were permanently confined virtually the entire day in one cell, received "meager" outside movement, and engaged in minimal prisoner contact, those inmates

---

4. Both parties agree that the district court effectively in its order gave the unassigned inmates at Ionia less yard time than they were already receiving, thus necessitating a remand on this issue (assuming, of course, the inmates are constitutionally entitled to yard time).

must receive one hour of outdoor exercise per day, five times a week. *See also Toussaint v. Yockey*, 722 F.2d 1490 (9th Cir. 1984).

■ We find it necessary to REMAND the matter of constitutional yard time requirements for consideration and clarification in accordance herewith considering the inmates' constitutional need for time outdoors. The district court should, of course, be mindful of the limitations placed on each class of inmates that might restrict prisoner interaction, as well as prison security requirements, and whether restrictions are "totally without penological justification." *Rhodes*, 452 U.S. at 346, 101 S.Ct. at 2399.

### B. Showers

■ The inmates also complain of restrictions placed on the number of showers allowed them each week. The district court found that Marquette general population inmates received three five-minute showers per week, reduced from six received weekly prior to the riot. Those in administrative segregation continued to receive only one shower per week, as before.

At the Jackson Central Complex, the general population and inmates in Cell Blocks 3, 4, 5, 7, 8, 11, and 12, were allowed to shower daily, but only as an alternative for a meal or yard period, not the same procedure as before the riots. Those in administrative segregation were found to be allowed only one shower every eight to eleven days, down from the pre-riot allotment of once per week.

At the Northside Complex, assigned inmates were found to be able to shower daily during their yard periods. On the other hand, unassigned inmates received only one shower per week. Before the riots, on the other hand, all Northside inmates were allowed daily showers. The trial court made no specific findings regarding showers at Ionia; thus there ap-

pears to be no issue that showers at that prison are unduly restricted.

The district court concluded that at Marquette the shower allotment was not unconstitutional. 544 F.Supp. at 360. Recognizing that sanitation is an important prison concern, the court concluded that the shower allotment presented no danger to personal hygiene and sanitation. As to the Jackson Central and Northside Complexes, however, the court ordered that the general population inmates be granted three showers per week, separate and apart from allotted yard time, in view of the requirement that to obtain a shower one would have to forego either meal or yard time. The court also directed that inmates in administrative segregation be allowed a minimum of one shower each week. Although somewhat troubled by the conclusions of the district court in regard to Jackson as they differ from Marquette to some slight degree, we are disposed to agree that the court's findings and conclusions are generally appropriate as stating minimal constitutional standards in respect to showers.[5] Because we remand the yard time issue, we express no opinion whether inmates who choose to shower must be afforded additional yard or meal time.

We recognize that sanitation is a major concern in prisons today. *See Rhodes*, 452 U.S. 337, 101 S.Ct. at 2392. In *Preston v. Thompson*, 589 F.2d 300 (7th Cir.1978), the court held that a district court could, within its proper role, order that inmates be afforded two showers per week. Likewise, in *Dorrough v. Hogan*, 563 F.2d 1259 (5th Cir.1977), the court upheld access to showers at least two times per week. We therefore AFFIRM the district court's order that prisoners in administrative segregation at Jackson, not in frequent contact with others, be afforded at least one shower per week as a constitutional minimum, and that general population inmates receive three showers per week, as being in substantial conformity with the precedent noted. Fi-

---

5. We can foresee why general population inmates, as a constitutional minimum, might require a greater frequency of showers than those confined in administrative segregation. They obviously work and otherwise interact with others so as to increase the need to preserve hygiene and sanitation, something not necessarily true of those confined to segregation.

nally, we agree with the district court's order that inmates at Marquette be allowed to wear appropriate clothing while walking to the showers.

## II. First Amendment Rights

The inmates claim that by restricting their access to group religious meetings, prison officials have violated their first amendment right to the free exercise of their religions. The district court agreed, after finding that at Marquette group religious services had been totally eliminated. Prior to the riot the prisoners enjoyed up to four and five hours of group prayer per week. 544 F.Supp. at 349. The court held that this "total ban" on group services violated the first amendment, even in light of the need for tighter security:

> On the other hand, the Court need not order [Marquette] to resume its pre-riot group religious activities schedule. Instead [Marquette] is allowed to devise a rotating attendance procedure with respect to group services. While [Marquette] is given considerable discretion in devising a plan, the Court nevertheless must lay down the requirement that each resident be granted at least half as much group service time as before the riot. By this approach, [Marquette] can develop a constitutionally acceptable plan and at the same time further the safety and security interest.

*Id.* at 362.

At the Jackson Central Complex, the court found inmates received one hour of group services per week, down from the pre-riot allowance of several hours per week. Apparently at the Northside Complex, only Muslim inmates were restricted in their group services. They received three hours per week, down from the pre-riot level of seven hours per week. At Ionia, the Muslims were allowed to continue a one hour service every Sunday, but a ninety minute week-night service was eliminated.

■ To correct what was deemed a first amendment violation at Jackson Central, the district court ordered an additional hour per week of "group religious activities." *Id.* at 363. In regard to the Northside Complex, the court concluded no first amendment violation had taken place, because three hours per week was reasonable. At Ionia, on the other hand, the court directed, in accordance with first amendment standards, restoration of pre-riot religious services of at least seven hours per week to the Muslim inmates. *Id.* at 365.

Prisoners do not lose the right to free exercise of their religion by virtue of their incarceration. *Cruz v. Beto,* 405 U.S. 319, 322 n. 2, 92 S.Ct. 1079, 1081 n. 2, 31 L.Ed.2d 263 (1972). However, the circumstances of prison life may require some restrictions on prisoners' exercise of their religious beliefs. The court must balance the prisoners' constitutionally protected interest in the free exercise of their religious beliefs against the state's legitimate interests in operating its prisons. *Brown v. Johnson,* 743 F.2d 408, 411 (6th Cir.1984), *cert. denied,* — U.S. ——, 105 S.Ct. 1190, 84 L.Ed.2d 336 (1985); *Weaver v. Jago,* 675 F.2d 116, 118 (6th Cir.1982). But the state cannot merely assert that its interests require restrictions on prisoners' exercise of their first amendment rights. It must prove the necessity of any restrictions it imposes, and it must demonstrate that "the prison's restriction was a reasonable time, place, and manner restriction of a First Amendment right." *Weaver,* 675 F.2d at 119.

■ The specific state interests here are the prison administrators' responsibility for security and discipline. They must ensure the safety of all inmates, prison employees, and the public at large. In any circumstance this is a difficult task, and in the prison environment shortly following a violent, destructive riot it is a matter of the gravest concern. Security requires "the circumspection or loss of many significant rights," and "these restrictions or retractions also serve, incidentally, as reminders that, under our system of justice, deterrence and retribution are factors in addition to correction." *Hudson v. Palmer,*

—— U.S. ——, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). When determining whether a particular restriction is reasonably related to prison security, the court should give considerable deference to prison administrators' expertise. *Block v. Rutherford,* —— U.S. ——, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984); *Hewitt v. Helms,* 459 U.S. 460, 467, 470, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675 (1983); *Bell v. Wolfish,* 441 U.S. 520, 547–48, 554–55, 562–63, 99 S.Ct. 1861, 1878–1879, 1882–1883, 1886–1887, 60 L.Ed.2d 447 (1979); *Weaver v. Jago,* 675 F.2d at 117; *Akbar v. Canney,* 634 F.2d 339, 340 (6th Cir.1980), *cert. denied,* 450 U.S. 1002, 101 S.Ct. 1712, 68 L.Ed.2d 205 (1981).

 The riots occurred in May 1981. There was a lockdown at the prisons which drastically curtailed inmate activities to restore security and impose discipline. In the immediate post-riot period the restrictions on group religious services were clearly constitutionally permissible. The irreducible core of the first amendment guarantee of the right of free exercise of religious beliefs is the right to practice privately any religion. *Thompson v. Kentucky,* 712 F.2d 1078, 1080 (6th Cir.1983). Defendants did not infringe this right by eliminating or reducing congregate religious services. Guard time had to be devoted as a first priority to securing the prisons and imposing the discipline of orderly confinement to prevent the destruction of property and to assure the safety of inmates and prison employees. The court must defer to the prison administrators' determination that in the near term post-riot environment, correctional officers did not have the ability to both ensure security and discipline and maintain the pre-riot levels of congregate religious services. There was a lock-down in the prisons, and the security situation was similar to that in administrative segregation units where prisoners who present greater security problems are incarcerated. The courts have consistently held that when prison officials offer evidence that security concerns prevent them from providing congregate religious services to inmates in administrative segregation, the deprivation is not violative of the first amendment so long as the inmates' rights of conscience are not infringed and they can request individual religious counseling. *See, e.g., McDonald v. Hall,* 579 F.2d 120, 121 (1st Cir.1978); *Sweet v. South Carolina Department of Corrections,* 529 F.2d 854, 863 (4th Cir.1975).

However, the parties here are not only addressing the immediate post-riot months, but also the years following the end of the lockdown. This case was tried from September 15 through November 12, 1981, just 4–6 months after the riots. The lockdowns were not all over until January 1, 1982, well after the record in this case was closed.

 The right to the free exercise of religious beliefs is an essential constitutional guarantee. Most religious faiths give a central role to congregate religious services. It is an important aspect of religious socialization, and it imparts a sense of religious fellowship which deepens religious conviction. Prisoners are cut off from most kinds of normal social intercourse. Government should consider the matter carefully before walling prisoners off from congregate religious services which many believe reinforce norms of behavior which may help the inmate avoid future criminal conduct.

 Prisoners in the general population may, consistent with the first amendment, be denied all congregate religious services during the normal course of the operation of a prison only when paramount security interest so dictate:

> Where an inmate's religious freedom is at stake, correctional officials may only adopt regulations which are "reasonably and substantially" justified by official concern for internal security and inmate discipline.... "Prison restrictions that impinge upon a prisoner's First Amendment right must be carefully scrutinized to ascertain the extent to which they are necessary to effectuate the legitimate policies and goals of the corrections sys-

tem." *Childs v. Duckworth,* 705 F.2d 915, 920 (7th Cir.1983).

*Brown v. Johnson,* 743 F.2d at 411–12 (citations omitted). Thus, in *Brown* the denial of congregate religious services to a homosexual religious group was upheld because of the dangers of violence from predatory prisoners. 743 F.2d at 412.

■■■■ Here the evidence of record relates entirely to the 6 month period following major rioting. It is obvious that security concerns may require substantial restrictions of the normal privileges of prison life during such a period. Moreover, it is conceivable that a re-evaluation of prison security might lead prison officials to conclude that following a complete return to the normal operation of the prison security concerns mandate fewer privileges than existed before the riots.

The district court focused entirely upon the differences in pre- and post-riot levels of congregate religious services. The district court did not set out the evidence relating to the particular security and discipline concerns which appellants assert limit the number of hours of congregate religious services they can make available to inmates. The district court erred in relying almost entirely on the comparison of pre- and post-riot hours of services. The first amendment requires the district court to balance the interests of the state in operating the prisons against the prisoners' constitutionally protected right to the free exercise of their religious beliefs. Although the pre-riot hours of congregate religious services may be some indication of how prison resources could be apportioned in the post-riot prison environment to assure security and permit the free exercise of religious beliefs, they do not in any sense establish a constitutionally mandated benchmark of group religious services. How the balance is struck between the state's interests in operating its prisons and the first amendment depends upon the conditions within those prisons at the time the balance is struck. The state's interests are clearly more compelling during an emergency or when the type of prisoner,

nature of the facility, or special circumstances make security a paramount concern.

Since the district court used an improper standard, plaintiff-appellees' free exercise claim for the post lockdown period must be remanded for application of the proper standard in the long term operation of the prison absent emergency circumstances. The district court should balance the security and discipline concerns identified by prison officials (in light of the security deficiencies highlighted by the riots, if any) which they believe prevent them from offering the prisoners the opportunity for greater congregate religious services privileges against the prisoners' free exercise rights.

## III. Access to the Courts

■■■ The district court concluded that post-riot limitations placed on library hours deprived the inmates of their right of reasonable access to the courts, in violation of *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), in which the Supreme Court held that "inmate access to the courts [must be] adequate, effective and meaningful." *Id.* at 822, 97 S.Ct. at 1495. Prisoners are to be supplied some means of obtaining legal assistance, be it in the form of adequate prison libraries, "jailhouse lawyers," or outside legal assistance. The Supreme Court did not, however, in *Bounds,* prescribe any specific amount of library time which prisoners must be provided; rather, access need only be reasonable and adequate.

The district court found that at Marquette, inmates have access to a law library on a "detailed basis only," totalling six hours per week. At the Jackson Northside Complex, inmates commonly were given only one hour per week library time, and at a maximum four and one-half hours per week; a drastic cut from the pre-riot twelve to fifteen hours per week allowance. Similarly, at the Central Complex, inmates were found to receive only two hours per week of library time, down from the pre-riot allotment of eleven hours per week. At Ionia, inmates received only one hour of

library time per week, whereas before they received ten hours of library time per week, along with relatively free access to jailhouse lawyers.

The court ordered that Marquette restore library access hours to pre-riot levels, although access could remain on a detailed basis.[6] At Jackson Central and Ionia, the court also ordered that access be restored to pre-riot levels (eleven hours per week and ten hours per week respectively). At the Jackson Northside Complex, the court ordered that inmates be assured access of four and one-half hours per week.

We are concerned with a right of access *to the courts*, not necessarily to a prison law library. There is no claim made here that any particular prisoner was actually impeded in his access to the courts. Rather, the inmates claim a general constitutional right to some minimum amount of time in the prison law library. We doubt that this constitutional claim is substantiated under the *Bounds* rationale. In *Twyman v. Crisp*, 584 F.2d 352 (10th Cir.1978), a prisoner who was allowed use of the prison law library only two hours per week claimed that he had been denied adequate access under *Bounds*. The court found no constitutional deficiency in light of the fact that the prisoner possessed the legal material he needed to pursue his claim. "If appellant [the prisoner] could show that he has somehow been prejudiced in any of his various lawsuits, he might perhaps have a legitimate claim." *Id.* at 357. Twyman could not, however, establish that he himself had ever been impeded in attempting to gain access to the courts within the applicable principles:

> [R]estricted access to the law library is not per se denial of access to the courts. *United States v. Evans*, 542 F.2d 805 (10th Cir.1976). Nor do either *Younger v. Gilmore*, 404 U.S. 15, 92 S.Ct. 250, 30 L.Ed.2d 142 (1971) or *Johnson v. Avery*, 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969) equate access to the courts with the adequacy of a prison law library. The prison library is but one factor in the

totality of all factors bearing on the inmates' access to the courts which should be considered. *Hampton v. Schauer*, 361 F.Supp. 641 (D.Colo.1973).

\* \* \* \* \* \*

> It has also been held that prison regulations which reasonably limit the times, places, and manner in which inmates may engage in legal research and preparation of legel papers do not transgress the constitutionally protected rights so long as the regulations do not frustrate access to the courts. *Gittlemacker v. Prasse*, 428 F.2d 1 (3d Cir.1970); see also *Frazier v. Ward*, 426 F.Supp. 1354 (N.D.N.Y. 1977).

*Id.* at 357, 358.

▉ Similarly, there exists no showing here that any prisoner has been denied access *to the courts* by the Michigan prisons' rules and regulations. These prisons provide additional assistance to any prisoner who demonstrates a need, and jailhouse lawyers are available. We are unable to conclude under these circumstances that all inmates are being denied access within the meaning of *Bounds*. We REVERSE the order of the district court on specification of time in prison libraries, and REMAND for the district court to consider whether adequate access to court has been denied any prisoner.

## IV. Due Process

▉ The final claim of the inmates stems from the imposition of administrative segregation upon those prisoners found by prison officials to have engaged in "major misconduct." The inmates allege that even though prisoners receive a hearing in relation to establishing that they engaged in major misconduct (consistent with *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)), they receive no hearing or notice before they are actually placed in administrative segregation. They argue that under the relevant Michigan administrative rules and policy

---

**6.** It is unclear from the record exactly what the pre-riot level was.

directives, administrative segregation may only be imposed where

(1) a resident demonstrates inability to be managed with group privileges;

(2) a resident needs protection;

(3) a resident is a serious threat to the physical safety of staff or other residents or to the good order of the facility; or

(4) a resident is a serious escape threat.

Mich.Admin.Code R. 791.4405; Policy Directive PD BCF–60.01. Plaintiffs argue that the foregoing rules and directives do not provide for administrative segregation where only "major misconduct" is involved. Because a major misconduct finding does not specifically indicate administrative segregation *under the cited rules and directives,* the inmates claim a right to a second hearing in order to determine whether one of the four criteria listed has been satisfied.

The district court rejected the inmates' argument, finding the single hearing to be constitutionally sufficient. In drawing its conclusion, the court found a liberty interest to exist under state law, but rejected the inmates' claim to any substantive due process interest. We agree. Any interest the inmates have in not being placed in administrative segregation must be drawn from state law. *Bills v. Henderson,* 631 F.2d 1287 (6th Cir.1980). The district court further concluded that the hearing afforded by the prisons was constitutionally sufficient. There was no need for a second hearing, because upon finding guilt of major misconduct, the prisons could properly impose administrative segregation.

In February 1980 a policy memorandum was circulated by the director of the Michigan Department of Corrections. Pursuant to this memorandum, any inmate could be transferred to administrative segregation upon a finding that he engaged in major misconduct. The focus of the inmates claim to a second hearing is that this particular memorandum has no substantive effect, that is, it is not a valid rule. By placing an inmate in administrative segregation without a specific finding that a valid criteria has been met, it is argued, the inmate has been deprived due process. *See Spruytte v. Walters,* 753 F.2d 498 (6th Cir.1985). Hence, the inmates submit a second hearing is required to connect a major misconduct finding with satisfaction of one of the previously listed criteria.

The problem with plaintiffs' argument is that it presupposes that a federal court should analyze a state administrative ruling to determine what is valid and binding. Contrary to language contained in a recent holding of another panel of this court, *Spruytte,* 753 F.2d 498, we conclude that a federal court should not rule upon the validity of a state regulation challenged on the sole ground that it was not properly adopted under state law by the state administrative agency. No federal question or constitutional issue is involved in such a challenge.[7] The Supreme Court has stated recently in this context, "[W]e have never held that the statutes and regulations governing daily operation of a prison system conferred any liberty interest in and of themselves." *Hewitt v. Helms,* 459 U.S. 460, 469–70, 103 S.Ct. 864, 869–70, 74 L.Ed.2d 675 (1983). Thus the Court in *Helms* concluded that a prison inmate does not, *based upon "simple procedural guidelines" prescribed by the state,* have a "protected liberty interest in remaining in

---

**7.** In *Spruytte* this court was concerned with whether a district judge abused his discretion in *sua sponte* dismissal of an *in forma pauperis* civil rights action. That limited issue was all that was involved.

In addressing the merits of the case in *Spruytte,* the court analyzed Michigan law in order to determine whether a protected property interest existed. As a matter of interpretation, such an analysis is a federal question. In concluding that a property interest was created, however, the court invalidated on *state* grounds the state's own regulation.

The present case is different because existence of a liberty interest is conceded. The *substance* of the liberty interest is challenged insofar as the state has conformed its rulemaking authority, and thereby its ability to define substance, to its own procedural requirements. This is *not* a federal question, and we do not read *Spruytte* as authority for striking down a state regulation in this regard.

the general prison population." 459 U.S. at 471, 103 S.Ct. at 871. (Emphasis on added language).[8] That Michigan created a statutory and/or administrative structure to regulate administrative segregation within the system does not, likewise, create a constitutional issue requiring that we examine the validity of its state regulations where minimum due process in the form of a hearing has been provided to determine whether an act of major misconduct has occurred. *Hewitt v. Helms, supra.*

The question is simply whether the memorandum issued by the Michigan Department of Corrections has any legal effect. If it does, then no federal rights are implicated. Though a liberty interest exists, a proper hearing is required by statute, *see* Mich.Stat.Ann. §§ 28.2320(51) [M.C.L.A. § 791.251] and 28.2320(52) [M.C.L.A. § 791.252] (Callaghnan Supp.1984), and this has undisputably been accomplished in conducting a hearing on whether major misconduct violations have taken place. Only if the memorandum is invalid as a substantive rule does plaintiffs claim have any merit, because only then would there be an absence of a finding of a valid "substantive predicate." *See Spruytte*, 753 F.2d at 508–09. In either case, the question is one of state law and requires no federal analysis.

In *Pennhurst State School & Hospital v. Halderman*, 465 U.S. 89, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984), the Supreme Court held that the Eleventh Amendment prohibits a federal court from granting prospective or retroactive relief against a state, or nominally against its officials, on the basis of state law. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." *Id.* at 911. This case, as was the situation in Pennhurst, is in actuality one against the State. The relief sought is declaratory and injunctive, and operates only nominally against the prison officials. *See id.* at 908.

It is not appropriate, then, for a federal court to order Michigan prison officials to conform their conduct to state law. We should not attempt to deal with state prisoners' efforts to invalidate a state agency regulation for not being in compliance with state administrative law. *See Pennhurst.* In this situation, a federal court must only *interpret* state law to determine whether a liberty interest exists, and whether due process requirements are met by a proper hearing prior to the deprivation of that interest. *See Greenholtz v. Inmates of the Nebraska Penal and Correctional Complex*, 442 U.S. 1, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979); *Bishop v. Wood*, 426 U.S. 341, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976); *Loudermill v. Cleveland Board of Education*, 721 F.2d 550 (6th Cir.1983), *aff'd*, —— U.S. ——, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985). The substance of what state law requires is a question for the state, absent some independent violation of the fourteenth amendment.

We AFFIRM the order of the district court with respect to the administrative segregation. The procedures afforded by the state, as partially modified by the district court, comport with due process requirements. *See Wolff*, 418 U.S. 539, 94 S.Ct. 2963; *Bills*, 631 F.2d 1287.

As a final matter, the district court concluded that the prisons' procedure of placing certain inmates on "green card" status was "equivalent to administrative segregation status." 544 F.Supp. at 355. Any differences between the two were found to be "de minimus." *Id.* This finding by the trial court is not clearly erroneous. We therefore AFFIRM the district court's order that all inmates placed on green card status be afforded the same procedural rights, including periodic review, as applied to those in administrative segregation.

## V. Conclusion

In sum, we REMAND for further consideration the district court's findings of eighth amendment violations, other than that set-

---

**8.** *Hewitt* found a liberty interest because the Commonwealth of Pennsylvania went "beyond

simple procedural guidelines." 459 U.S. at 471, 103 S.Ct. at 871.

ting aside the requirement at Marquette that prisoners walk naked to the showers. We REVERSE the district court's orders in relation to asserted *Bounds* violations, but REMAND this aspect of the case for further consideration not inconsistent with this opinion. We likewise REVERSE the order of the district court based on purported violations of the inmates' first amendment rights, and REMAND for further consideration in accordance with this opinion. We AFFIRM the district court's judgment in all other regards.

KINNEARY, District Judge, concurring.

I join Parts I through III of the Court's Opinion, but concur in the result reached in Part IV without joining its reasoning. In my opinion, the reliance upon *Pennhurst State School & Hospital v. Halderman, supra* is unnecessary. The district court should be affirmed on the basis of *Hewitt v. Helms, supra* which is controlling.