NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 11a0367n.06

No. 09-5529

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

FILED

*Jun 01, 2011*

LEONARD GREEN, Clerk

| | | |
|---|---|---|
| ANTHONY HAYES, | ) | |
| | ) | ON APPEAL FROM THE |
| Plaintiff - Appellant, | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| v. | ) | DISTRICT OF TENNESSEE |
| | ) | |
| STATE OF TENNESSEE; | ) | |
| TENNESSEE DEPARTMENT OF | ) | |
| CORRECTION; ROLAND COLSON; | ) | |
| JACK MORGAN, Warden; JIM | ) | |
| WORTHINGTON, Warden; BOBBY | ) | |
| WALLS, Chaplain; JOE | ) | |
| CHRICHTON, Chaplain; STEVE | ) | |
| CANTRELL, Unit Manager; PAUL | ) | |
| FLANDERS; DENISE HALL, | ) | |
| Corporal; GEORGE LITTLE, | ) | |
| Commissioner of the Department of | ) | |
| Correction, Individually and in their | ) | |
| Official Capacity, | | |
| | | |
| Defendants - Appellees. | | |

_____

Before:  GIBBONS and WHITE, Circuit Judges; and OLIVER, Chief District Judge.[*]

**HELENE N. WHITE, Circuit Judge.**  Plaintiff Anthony Hayes appeals the district court's

grant of summary judgment to Defendants, dismissing his 42 U.S.C. § 1983 claim alleging a First

Amendment violation and his claim under the Religious Land Use and Institutionalized Persons Act

of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc-1.  We AFFIRM the dismissal of the First Amendment

_____

[*]The Honorable Solomon Oliver, Jr., Chief Judge of the United States District Court for the Northern District of Ohio, sitting by designation.

claim, REVERSE the dismissal of the RLUIPA claim, and REMAND for further proceedings consistent with this opinion.

## I.

Hayes is serving a sentence for first-degree murder, aggravated burglary, and two counts of felony escape. He has been an inmate of the Tennessee Department of Correction ("TDOC") since 1975. In April of 2005, while confined at the Brushy Mountain Correctional Complex in Petros, Tennessee, Hayes requested that the prison recognize his membership in the religious group Christian Israel Identity and change his religious preference accordingly on all TDOC forms. Hayes also requested literature by mail from the New Christian Crusade Church of Matairie, Louisiana. After the prison received the literature, Warden Jack Morgan ("Warden") rejected it pursuant to TDOC Policy 507.02. The Warden determined that the literature contained Security Threat Group ("STG") information "relating to an activity that pose[d] a potential risk to the security of the facility and safety of inmates and staff."

TDOC Policy 507. 02 provided at pertinent times:

IV. <u>DEFINITIONS</u>:

P. <u>Security Threat Group (STG)</u>: Group of individuals possessing common characteristics which serve to distinguish them from other groups who have been determined to be acting in concert so as to pose a threat or potential threat to staff, other inmates, the institution, or the community.

V. <u>POLICY</u>: Each institution shall maintain a mail room for the sending, receipt, and distribution of staff and inmate mail. Inmates may exchange mail, other than packages, with any person . . . provided that it does not jeopardize the safety, security, or operation of the institution or the safety of persons within or outside the institution.

VI. <u>PROCEDURES</u>:

2

C.      Incoming mail shall be handled as follows:

3.  Incoming mail may be determined to be a threat to the security of the institution and returned to the sender, if, in the opinion of the warden, it could reasonably be considered to:

a.      Be an attempt to incite violence based on race, religion, sex, creed, or nationality.
b.      Advocate, facilitate, or otherwise present a risk of lawlessness, violence, anarchy, or rebellion against government authority.
c.      Be an attempt to incite disobedience toward law enforcement officials or prison staff.
. . . .
g.      Contain information relating to security threat group activity or use of codes and/or symbols associated with security threat groups.
h.      Contain materials specifically found to be detrimental to prisoner rehabilitation because it could encourage deviate criminal sexual behaviors.

The religious literature the Warden rejected contained messages of white supremacy and racial purity, such as "[t]he Bible is the genesis of, the history of, and the prophecy for, the WHITE RACE only" and "[t]he Jews . . . are the mongrelized descendants of Satan through Cain. . . ."

Hayes claimed that once he discovered that the requested mail had been rejected, he asked fellow inmate Lloyd Harper to order the same literature.  Harper did so and received the literature without intervention by the Warden.  Harper attested to his membership in the Christian Identity Faith, as well as his receipt of the same and similar religious materials on several occasions before and after the prison rejected Hayes's mail.

Hayes filed several inmate grievances and appealed the Warden's decision to reject his mail. On June 7, 2005, TDOC Assistant Commissioner of Operations, Roland Colson, denied Hayes's appeal based on the determination that "the contents of this mail contain[ed] text denigrating various

3

races of people and promoting supremacist ideologies" in violation of TDOC Policy 507.02, which "could possibly jeopardize the safe, secure, and orderly operation of the institution."

Hayes filed suit *pro se*, alleging deprivation of his First Amendment rights to free speech, and free exercise of religion, or equal protection, in violation of 42 U.S.C. § 1983, and violation of the RLUIPA. Hayes originally sought monetary and injunctive relief but later withdrew his request for damages and pursued only injunctive relief. Hayes does not pursue the free speech and equal protection claims on appeal. *See infra* n.2.

The district court denied Defendants' initial motion for summary judgment without prejudice pending further discovery. The court granted Defendants' renewed motion, finding TDOC Policy 507.02 constitutional both on its face and as applied to Hayes and that Defendants' rejection of Hayes's mail did not violate the RLUIPA. The court also found Hayes's claims regarding Defendants' failure to change his religious designation in the TDOC computer system to be moot because the change was ultimately made. Hayes does not challenge that ruling on appeal.

**II.**

This court reviews *de novo* a district court's grant of summary judgment pursuant to Federal Rule of Civil Procedure 56. *S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 559 (6th Cir. 2007). "Summary judgment is proper if the evidence, taken in the light most favorable to the nonmoving party, shows that there are no genuine issues of material fact and that the moving party is entitled to a judgment as a matter of law." *Id.*

**A. FIRST AMENDMENT FREE-EXERCISE CLAIM**

Hayes's sole constitutional claim on appeal is that the district court erred in granting Defendants summary judgment on his First Amendment free-exercise claim. He asserts that a

4

genuine issue of material fact is created by the fact that Defendants applied TDOC Policy 507.02 to deny him the same religious literature received by his fellow inmate, Harper.

Hayes's statement of the issue focuses exclusively on the fact that Defendants applied TDOC Policy 507.02 to him and not another inmate. Hayes's statement of argument is more general – that Defendants violated the First Amendment and the RLUIPA by denying him access to religious literature. The argument is unclear as to whether Hayes is challenging the application of the TDOC Policy in the first instance to deny him the materials or the fact that fellow inmate Harper was allowed access while Hayes was not. In the final analysis, Hayes's First Amendment argument seems to be that Defendants discriminatorily applied TDOC Policy 507.02 only to him and not to fellow inmate Harper, without explaining the legitimate penological interests served.

### 1.

The First Amendment provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ." U.S. CONST. amend. I. The First Amendment is applicable to the States through the Fourteenth Amendment. *Cantwell v. Connecticut*, 310 U.S. 296, 303 (1940). Prisoners retain the First Amendment right to the free exercise of their religion. *Walker v. Mintzes*, 771 F.2d 920, 929 (6th Cir. 1985). However, "the circumstances of prison life may require some restrictions on prisoners' exercise of their religious beliefs," requiring a court to "balance the prisoners' constitutionally protected interest in the free exercise of their religious beliefs against the state's legitimate interests in operating its prisons." *Id.* When a prison regulation substantially infringes on an inmate's First Amendment religious practices, "the regulation is valid if it is reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89 (1987). Several factors are considered in determining the reasonableness of

5

a prison regulation. First, "there must be a 'valid, rational connection' between the prison regulation and the legitimate governmental interest put forward to justify it." *Id.* (quoting *Block v. Rutherford*, 468 U.S. 576, 586 (1984)). Second, the court must consider "whether there are alternative means of exercising the right that remain open to prison inmates." *Id.* at 90. Third, the court should weigh the impact that the asserted constitutional right will have on the rights of prison guards and other inmates, as well as the allocation of prison resources. *Id.* Fourth, "the absence of ready alternatives is evidence of the reasonableness of a prison regulation." *Id.*

As maintaining security, order, and discipline are essential goals of a corrections system, prison officials are accorded wide latitude in the adoption and application of prison policies and procedures. *See Bell v. Wolfish*, 441 U.S. 520, 546-47 (1979). "[B]ecause 'the problems of prisons in America are complex and intractable,' and because courts are particularly 'ill equipped' to deal with these problems, [courts] generally have deferred to the judgments of prison officials in upholding these regulations against constitutional challenge." *Shaw v. Murphy*, 532 U.S. 223, 229 (2001) (quoting *Procunier v. Martinez*, 416 U.S. 396, 404-05 (1974)) (internal citation omitted). Further, "[w]here a state penal system is involved, federal courts have . . . additional reason to accord deference to the appropriate prison authorities." *Turner*, 482 U.S. at 85. Thus, Hayes bears the burden of "overcom[ing] the presumption that the prison officials acted within their broad discretion." *Shaw,* 532 U.S. at 232 (2001) (internal quotations and citation omitted).

## 2.

In *Thompson v. Campbell*, 81 F. App'x 563 (6th Cir. 2003), this court held TDOC Policy 507.02(VI)(C)(3)(b) constitutional on its face in a case involving a ban on mail advocating anarchy, concluding that the policy passed muster under *Turner* and *Thornburgh v. Abbott*, 490 U.S. 401, 415

6

(1989):

*First*, prison officials have articulated a rational connection between the policy and legitimate and neutral penological interests. Maintaining security constitutes a legitimate penological interest, *Thornburgh v. Abbott*, 490 U.S. 401, 415 [ ] (1989), as does rehabilitating prisoners, *Pell v. Procunier*, 417 U.S. 817, 823 [] (1974). And regulations are "'neutral' in the technical sense in which [the Supreme Court] meant and used that term in *Turner*," when, as with these regulations, they "draw distinctions between publications solely on the basis of their potential implications for [a legitimate penological objective]." *Thornburgh*, 490 U.S. at 415-16. As for a "rational connection" between the policy and these interests, the issue is not whether the prohibited materials have in fact caused problems or are even "likely" to cause problems, but whether a reasonable official might think that the policy advances these interests. *See id.* at 417. Surely in this instance the relationship between the policy (prohibiting materials that advocate anarchy or contain obscenity) and the goals (security, order, and rehabilitation) is not "so remote as to render the policy arbitrary or irrational." *Turner*, 482 U.S. at 89-90. Because anarchy and obscenity are incompatible with security, order, and rehabilitation, this policy falls well within the realm of the reasonable.

*Second*, alternative means of exercising First Amendment rights remain open under the policy. According to the Supreme Court, the right in question must be read "sensibly and expansively." *Thornburgh*, 490 U.S. at 417. Here, the right in question is the right to receive and read publications. *See id.* at 417-18. And, as *Thornburgh* instructs, when the regulation permits "a broad range of publications to be sent, received, and read," as does the one here, a court must conclude that alternative means of exercising the right remain open. *See id.* at 418. . .

*Third*, a policy permitting prisoners to receive materials that advocate anarchy or contain obscenity would have a significant impact on prison guards, other inmates, and the allocation of prison resources. . . While, on this record, we have no reason to believe that [the plaintiff] will rise up against his jailors or engage in deviant sexual conduct should he possess such materials, we cannot discount the possibility that other more volatile prisoners will. Nor can we discount the costs of requiring prison administrators to allow some prisoners access to such materials while ensuring that others do not gain access to them. "[T]he courts should defer to the 'informed discretion' of corrections officials" on questions like these. *Thornburgh*, 490 U.S. at 418 (quoting *Turner*, 482 U.S. at 90).

*Fourth*, this regulation does not represent an "exaggerated response to the problem at hand." [The plaintiff] has not met his burden of "point[ing] to an alternative that fully accommodates [his] rights at *de minimis* cost to valid penological interests." *Thornburgh*, 490 U.S. at 418. . . .

7

*Thompson*, 81 F. App'x at 567-68. *See also Goss v. Myers*, 208 F.3d 213, 2000 WL 125905 (6th Cir. Jan. 28, 2000) (unpublished disposition) (upholding dismissal of inmate's complaint against prison officials who had rejected certain Hebrew Israelite Identity literature under TDOC policy in light of need to maintain prison security);[1] and *Mize v. Lewis,* No. 3:03-CV-601, 2006 WL 2711688 (E.D. Tenn. Sept. 21, 2006) (unpublished opinion), discussed *infra* at 9-10.

The parties cite no Sixth Circuit case involving the disparate application of a prison policy to two inmates belonging to the same religious group, nor a similar case from another Circuit. Hayes relies on two state-court cases (from New York and Ohio) to support his argument that application of the TDOC policy here was unconstitutionally discriminatory. Both are distinguishable from the instant case.

In *People ex rel. Rockey v. Krueger*, 62 Misc.2d 135, 136; 306 N.Y.S.2d 359 (1969), a Muslim prisoner who had been held in solitary confinement for refusing to shave his beard filed suit against the warden seeking to be released from solitary confinement. *Id.* at 136. The warden cited a corrections policy requiring prisoners to be clean-shaven for purposes of maintaining health and hygiene in the prison. A supervisory prison officer testified that while the Islamic faith was not a recognized religion in the prison, "an Orthodox Jew would not be required to shave his beard, and that while he would be isolated from other prisoners it would not be in a solitary confinement cell." *Id.* at 136-37. Accordingly, the court ordered the release of the plaintiff from solitary confinement, finding that because this evidence revealed unconstitutional discrimination against the plaintiff, the court did not have to address whether the policy itself was valid. *Id.*

---

[1]Goss sued several TDOC officials, as well as the warden of the South Central Correctional Facility. The opinion does not state which TDOC regulation Goss claimed had been violated.

In the second case, *Karmasu v. Tate*, 94 CA 2217, 1994 WL 521235 (Ohio Ct. App. Sept. 15, 1994), the plaintiff inmate appealed the grant of summary judgment of his ten claims of religious discrimination against the warden of the facility in which he was housed, including denial of the right to wear the Sikha hairstyle. *Id.* at *6. Citing *Rockey*, the court remanded the issue "whether members of other religions [were] permitted to groom in accordance with their religious beliefs" noting that "the state offered nothing to show that no genuine issue existed as to any material fact regarding the Sikha hairstyle . . . ." *Id.* If the lower court were to find that members of other religious groups were afforded rights that plaintiff was denied, "then, absent a showing that the prohibition serve[d] some legitimate penological interest, the rights must also be afforded members of the Hindu religion." *Id.*

Hayes contends that summary judgment was improper here because Defendants failed to explain why he was denied the right to certain religious literature while Harper was not. Defendants assert that the cases Hayes cites do not involve the issue here – the application of a prison policy to two members of the same group – and argue that the fact that one member of a religious group is able to receive religious literature and another is not does not support a claim of discrimination *on the basis of his religion*.

In arguing the reasonableness of their application of TDOC 507.02 to Hayes's mail, Defendants emphasize the racist content of the religious materials and the fact that Hayes has been convicted of violent felonies and is held in maximum-security custody. Defendants cite *Mize*, an Eastern District of Tennessee case on which the district court relied, in which an inmate filed a civil rights action against prison officials for violating his First Amendment rights by refusing to allow the inmate to correspond with groups outside the prison practicing the Christian Identity Faith. 2006

9

WL 2711688, at *2-3. The warden had personally reviewed and rejected the plaintiff's requested literature pursuant to TDOC policy 507.02, finding that it "promoted racism, anti-Semitism, and white separatist views, and thus contained information relating to a security threat group activity." *Id.* at *2. A prison coordinator had also prohibited the plaintiff from mailing letters to Jesus Christ Christian of the Aryan Nation because he was a member of the Security Threat Group Program.[2] *Id.* at *3. The district court granted the defendants' summary judgment motion, finding TDOC 507.02 constitutional on its face and noting that the plaintiff was "free to believe what he wants to believe, but it was within [the warden's] discretion, pursuant to TDOC policy, to refuse plaintiff possession of literature she found to involve security threat group activity. Such refusal was reasonably related to the essential goal of maintaining prison security." *Id.* at *5-6. *See also Goss*, 2000 WL 125905, at *1; *Bruton v. McGinnis*, 110 F.3d 63, 1997 WL 139797 (6th Cir. Mar. 26,1997) (unpublished opinion) (affirming dismissal of prisoner's civil rights action for rejection of mail pertaining to Christian Identity Faith for purpose of maintaining safety and security within facility); *Puryear v. Mills*, No. 3:03-CV-473, 2005 WL 1118050 (E.D. Tenn. May 10, 2005) (unpublished opinion) (granting summary judgment in favor of prison officials, finding that it was within warden's discretion to refuse plaintiff prisoner's possession of Christian Identity Faith book pursuant to TDOC 507.02 for its white supremacist nature, and that such refusal was reasonably related to preserving prison security).

---

[2]The goal of the STG program "is for an inmate to dissociate from the security threat group, and thus an inmate of the program is not allowed to correspond with security threat groups." *Mize*, 2006 WL 2711688, at *2. Hayes testified on deposition that, as far as he knows, he has never been designated an STG member, but rather, has been administratively segregated due to an attempted escape in 1995. However, Hayes testified later in his deposition that until the TDOC stops categorizing his religious group as an STG, his First Amendment rights will continue to be violated.

Courts accord prison officials wide discretion in adopting and applying policies and procedures necessary to preserve safety, order, and discipline within corrections facilities. *See, e.g., Bell*, 441 U.S. at 546-47. And, as discussed, TDOC Policy 507.02 has been determined to serve legitimate penological interests. Therefore, unless Hayes raises a genuine issue whether Defendants' application of the policy to his circumstances was not reasonably related to these interests, it is presumed that Defendants acted within their broad discretion. *See Shaw*, 532 U.S. at 232 (stating that to prevail on claim that prison regulation was unconstitutionally applied to inmate, inmate must overcome presumption that prison officials acted within their broad discretion) (internal citation and quotation omitted); *Thompson*, 81 F. App'x at 567-68 (stating that to succeed on claim of unconstitutional application of prison regulations, inmate bears "heavy burden" of "overcom[ing] the presumption that the prison officials acted within their 'broad discretion.'" (quoting *Shaw*, 532 U.S. at 232)).

Not surprisingly, the discretion exercised by officers in applying prison policies at times leads to inconsistent results. In *Thornburgh*, the Supreme Court acknowledged that the broad discretion accorded wardens by prison regulations, even when rationally related to legitimate security interests, may produce inconsistent results within and between prisons of a single corrections system over time. *Id.* The plaintiffs in *Thornburgh* were inmates and publishers who challenged a Federal Bureau of Prisons regulation permitting prison officials to reject incoming publications determined to be "detrimental to the security, good order, or discipline of the institution, or if it might facilitate criminal activity." *Id.* at 403. Applying the *Turner* factors, the Supreme Court concluded that the broad discretion accorded prison officials by the regulation was rationally related to these legitimate interests despite the potential it created for inconsistent application:

11

[W]e are comforted by the individualized nature of the determinations required by the regulation. Under the regulations, no publication may be excluded unless the warden himself makes the determination that it is "detrimental to security, good order, or discipline of the institution or … might facilitate criminal activity." . . . . We agree that it is rational for the Bureau to exclude materials that, although not necessarily "likely" to lead to violence, are determined by the warden to create an intolerable risk of disorder under the conditions of a particular prison at a particular time.

The exercise of discretion called for by these regulations may produce seeming "inconsistencies," but what may appear to be inconsistent results are not necessarily signs of arbitrariness or irrationality. Given the likely variability within and between institutions over time . . . greater consistency might be attainable only at the cost of a more broadly restrictive rule against admission of incoming publications.

*Id.* at 416-17, n.15. Similarly, in *Thompson*, this court found that the fact that TDOC Policy 507.02 grants broad discretion to prison officers and the reality that those officers apply the policy differently in different prisons within the system does not affect the constitutional analysis of the policy. *See* 81 F. App'x at 568 (citing *Thornburgh*, 490 U.S. at 416-17, n.15).

In the instant case, summary judgment was proper because Hayes did not present evidence sufficient to demonstrate that Defendants' rejection of his requested religious literature was for reasons other than taking reasonable measures to maintain prison security. *See Shaw*, 532 U.S. at 232; *Thompson*, 81 F. App'x at 567-68.

## B. RLUIPA CLAIM

The RLUIPA, which expands the First Amendment protections accorded prisoners with respect to their religious beliefs, provides in Section 3:

No government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution, as defined in section 1997 of this title, even if the burden results from a rule of general applicability, unless the government demonstrates that imposition of the burden on that person--

(1) is in furtherance of a compelling governmental interest; and

12

(2) is the least restrictive means of furthering that compelling governmental interest. § 2000cc-1(a)(1)-(2).  Section 3 applies in instances where "the substantial burden is imposed in a program or activity that receives Federal financial assistance," such as a prison system.  § 2000cc-1(b)(1).

Hayes argues that Defendants failed to demonstrate that their compelling interest in penal security was furthered by restricting his receipt of the literature while permitting Harper to receive the same literature, and that Defendants failed to establish that rejecting his mail was the least restrictive means of furthering the prison's security interest when the same mail entered the prison through another inmate.

**1.**

The purpose of the RLUIPA is to "protect[] institutionalized persons who are unable freely to attend to their religious needs and are therefore dependent on the government's permission and accommodation for exercise of their religion."  *Cutter v. Wilkinson*, 544 U.S. 709, 721 (2005). However, "prison security is a compelling state interest" and "deference is due to institutional officials' expertise in this area."  *Id.* at 725 n.13.  Accordingly, the RLUIPA does not "elevate accommodation of religious observances over an institution's need to maintain order and safety." *Id.* at 722.  Further, in applying the RLUIPA, "courts must take adequate account of the burdens a requested accommodation may impose on nonbeneficiaries . . . and they must be satisfied that the Act's prescriptions are and will be administered neutrally among different faiths . . . ."  *Id.* at 720 (internal citations omitted).

An inmate asserting a claim under the RLUIPA must first produce prima facie evidence demonstrating that his religious exercise was substantially burdened.  *See* § 2000cc-2(b); *Barhite v.*

*Caruso*, 377 F. App'x 508, 511 (6th Cir. 2010) (unpublished disposition). An action of a prison official "will be classified as a substantial burden when that action forced an individual to choose between 'following the precepts of [his] religion and forfeiting benefits' or when the action in question placed 'substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" *Barhite*, 377 F. App'x at 511 (quoting *Living Water Church of God v. Charter Twp. of Meridian*, 258 F. App'x 729, 734 (6th Cir. 2007) (quoting *Sherbert v. Vernier*, 374 U.S. 398, 404 (1963), and *Thomas v. Review Bd. of Ind. Emp't Sec. Div.*, 450 U.S. 707, 717-18 (1981))).

The government then bears the burden of persuasion to prove that any substantial burden on the inmate's exercise of his religious beliefs was "in furtherance of a compelling governmental interest" and imposition of the substantial burden on the inmate is "the least restrictive means of furthering that compelling governmental interest." §§ 2000cc-2(b), 2000cc-1(a)(1)-(2). If a substantial burden on religion is found, the RLUIPA employs a less deferential standard – the least restrictive means of furthering a compelling governmental interest – than the standard applied to religious exercise First Amendment claims, a uniform rule having a reasonable relation to legitimate penological interests. *See Cutter*, 544 U.S. at 712.

## 2.

Defendants' motion for summary judgment did not argue that Hayes failed to produce prima facie evidence demonstrating that his religious exercise was substantially burdened. Rather, Defendants asserted that rejection of Hayes's mail furthered their compelling interest in penal security and was the least restrictive means to reduce STG activity and violence in the prison.

Hayes's response to Defendants' summary judgment motion asserted that a reasonable alternative to Defendants' rejection of his religious literature in its entirety would have been for

Defendants to permit the mail to pass to him either uncensored or redacted. Because Defendants did not respond to this argument and the district court did not address it, summary judgment was improperly granted. Nor have Defendants explained why they have a compelling interest in prohibiting Hayes from receiving the material, while permitting Harper to receive it and Hayes to secure it through Harper.

## CONCLUSION

For the reasons stated, we **AFFIRM** the dismissal of Hayes's First Amendment free-exercise claim, **REVERSE** the dismissal of his RLUIPA claim, and **REMAND** for further proceedings consistent with this opinion.