940 F.2d 658
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Philip Wayne BERRYMAN and Chester Joseph Krupinski,
Plaintiffs-Appellants,
v.
Perry M. JOHNSON, et al., Defendants-Appellees.
 Nos. 88-1239, 88-1280.
 United States Court of Appeals, Sixth Circuit.
 Aug. 6, 1991.
 
 Before MERRITT, Chief Judge, DAVID A. NELSON, Circuit Judge, and CELEBREZZE, Senior Circuit Judge.
 DAVID A. NELSON, Circuit Judge.
 
 
 1
 This is a civil rights case brought in federal district court under 42 U.S.C. Sec. 1983 by two prison inmates who, when their complaint was filed in 1980, were confined at the State Prison of Southern Michigan. The plaintiffs alleged that the defendants--Michigan Department of Corrections Director Perry M. Johnson, together with the warden of the prison and four other prison officials--were responsible for conditions of confinement that violated the plaintiffs' rights under the constitutions of the United States and Michigan. Among the conditions complained of, as set forth in an amended complaint filed in 1986, were these:
 
 
 2
 "a. the food was served on trays with old and caked on dirt and food; and was exposed to vermin, insects and birds;
 
 
 3
 b. the heating system was so inadequate that the temperature was frequently unhealthy and unsafe;
 
 
 4
 * * *
 
 
 5
 * * *
 
 
 6
 d. the residents were not allowed adequate out of cell exercise;
 
 
 7
 * * *
 
 
 8
 * * *
 
 
 9
 g. there was an overall lack of sanitation."
 
 
 10
 Asserting that the plaintiffs suffered emotional damages, but not asserting any illness or physical injury, the amended complaint asked for a money judgment in an unspecified amount.
 
 
 11
 The defendants, who were sued in their individual and official capacities, moved for summary judgment both on the ground that the plaintiffs had not been subjected to cruel and unusual punishment and on grounds of qualified immunity and immunity under the Eleventh Amendment. The district court (Gilmore, J.), acting on a magistrate's report which the court accepted in part and rejected in part, held (1) that the defendants were not entitled to either type of immunity; (2) that the defendants were nonetheless entitled to summary judgment with respect to certain of the claims against them, including the out-of-cell exercise claim, because the conditions complained of did not amount to cruel and unusual punishment; and (3) that material issues of fact precluded the granting of summary judgment with respect to the food, sanitation, and heating claims.
 
 
 12
 Following the denial of a motion to alter or amend the judgment, the defendants attempted to perfect an interlocutory appeal pursuant to Mitchell v. Forsyth, 472 U.S. 511 (1985). The plaintiffs took a cross-appeal from the adverse judgment on their out-of-cell exercise claim.
 
 
 13
 Under the rule adopted by this court in Minority Employees of the Tennessee Department of Employment Security, Inc. v. Tennessee Department of Employment Security, 901 F.2d 1327 (6th Cir.) (en banc), cert. denied, 110 S.Ct. 210 (1990), the defendants' notice of appeal did not adequately specify as an appellant anyone other than Perry M. Johnson, the head of the state corrections department. We must therefore dismiss the appeal for want of jurisdiction insofar as the other defendants are concerned.
 
 
 14
 To the extent that the plaintiffs have attempted to assert their claims against defendant Johnson in his official capacity, the State of Michigan is the true defendant. The state not having given its consent to be sued, and the state's immunity not having been abrogated by Congress, this element of the case should have been dismissed on the ground of sovereign immunity.
 
 
 15
 No such immunity attaches to defendant Johnson in his individual capacity, and on the record before us, although the issue is close, we cannot disagree with the district court's conclusion that there are material issues of fact precluding summary judgment with regard to the food and sanitation claims asserted against Mr. Johnson in his individual capacity. Neither can we say that Mr. Johnson enjoys qualified immunity as to these claims. In our view, however, Mr. Johnson was entitled to judgment on the heating claim; whether or not he was "deliberately indifferent" to the heating conditions in the plaintiffs' cells, the plaintiffs simply cannot show that these conditions fell below any recognized constitutional norm.
 
 
 16
 As to the out-of-cell exercise claim, the district court was asked to certify, pursuant to 28 U.S.C. Sec. 1292(b), that there is a substantial ground for difference of opinion and that an immediate appeal might materially advance the ultimate termination of the litigation. The district court did not make the requested certification, and we shall dismiss the plaintiffs' cross-appeal as premature.
 
 
 17
 * Plaintiff Philip Wayne Berryman, who is serving a life sentence for first-degree murder, was transferred to the State Prison of Southern Michigan ("SPSM") on August 17, 1979, following disciplinary proceedings against him at another facility. His initial housing assignment at SPSM was in Five-Block, a block of cells reserved for prisoners in administrative segregation and protective custody. (Mr. Berryman needed protection from certain inmates and staff, he tells us in his brief, because he had testified against them in relation to a drug-smuggling operation within the prison.) In the spring of 1980 Mr. Berryman was moved to a different cellblock, known as Seven-Block, the two upper galleries of which were reserved for protective custody prisoners. Mr. Berryman was transferred out of SPSM some months later.
 
 
 18
 Plaintiff Chester Joseph Krupinski, who had been incarcerated at another facility on a breaking and entering conviction, was assigned to SPSM in 1979 following a conviction for escape from the first facility. At SPSM he became involved in the distribution of ersatz moonshine. Approximately 200 inmates made purchases of this product. The record indicates that one inmate died from drinking it, several were hospitalized, and many were made ill. As a result of this episode, Mr. Krupinski was placed in administrative segregation in a Five-Block cell pending possible criminal action against him. He remained in that status from May 20, 1979, to October of 1979, when the authorities decided not to prosecute. Mr. Krupinski was then moved from the west side of Five-Block to the east side under a protective custody classification. (Because his moonshine had "[t]urned out to be poison," he testified at his deposition, he needed protection from "[f]our thousand some inmates inside of the walls.") On February 1, 1980, Mr. Krupinski was moved from SPSM to a correctional facility in another part of the state.
 
 
 19
 Mr. Krupinski's lawsuit relates solely to the conditions under which he was housed in Five-Block between May 20, 1979, and February 1, 1980. Mr. Berryman's lawsuit relates to the conditions he experienced in Five-Block and Seven-Block between August 17, 1979, and the time of his transfer out of SPSM in 1981.
 
 
 20
 The two cellblocks in question had procedures that differed from those observed elsewhere in the prison with respect to meal service and with respect to prisoners being allowed outside their cells other than at mealtime. Because it was dangerous for protective custody prisoners to walk across the prison yard to the central dining facilities, just as it was dangerous for them to eat with members of the general population, prisoners in the protective custody galleries of Seven-Block took their meals in a common area located within the cellblock itself. It may have been more difficult to maintain proper sanitation there than in the central dining hall. We infer from the record that the Seven-Block dining area was under a roof, but the windows were sometimes broken by prisoners--more frequently in the summer than in the winter, it appears--and doors were kept open for ventilation. It was difficult to keep birds out during the summer months, and the difficulty was compounded by the propensity of prisoners to feed them. The plaintiffs say that the birds, like the mice and cockroaches referred to hereafter, contributed to a general lack of sanitation.
 
 
 21
 Seven-Block had its own fenced-in exercise yard, which protective custody prisoners could use without coming into contact with the general prison population. The record contains summaries of cellblock logs indicating that protective custody prisoners could use the exercise yard on a more or less daily basis. "If it didn't rain or snow," plaintiff Berryman testified, "they allowed you to go outside if they had enough staff."
 
 
 22
 Five-Block, unlike Seven-Block, had neither a central dining area nor an outdoor exercise yard. (Five-Block did have an indoor basketball court, according to the deposition testimony of a deputy warden; there is no indication that either plaintiff was allowed to use it, but plaintiff Krupinski did testify that on the east side of Five-Block, where he occupied a cell next to plaintiff Berryman when both were in protective custody status, prisoners sometimes exercised by walking up and down the hallway.) There is evidence that prisoners placed in administrative segregation on the west side of Five-Block--where Mr. Berryman spent the first month of his Five-Block time--were never allowed out of their cells for exercise or recreation. Mr. Berryman testified that he was not permitted to exercise more than three times a week when he was housed in Five-Block-East. Except for those who had jobs as hall porters, all prisoners assigned to Five-Block ate their meals from trays given them in their cells; there was no "congregate feeding" there, as there was in Seven-Block.
 
 
 23
 It is clear that cockroaches and mice, together with birds, were a problem in both cellblocks. Plaintiff Krupinski testified that he saw mice in his Five-Block cell on "a few different occasions," and plaintiff Berryman testified that mice came out of the heating grills with which the cells were equipped. (Berryman also testified that the mice were not as bad in Seven-Block as in Five-Block.) Krupinski claims to have seen a dead mouse in a large container of soup, and Berryman claims that he and others found a cooked mouse in a food tray. Unsworn entries from a daily diary of some sort that plaintiffs' counsel attributes to a prisoner named David Crusore depict a wide variety of food problems, including some involving rodent feces.[1] There is evidence of cockroaches in the cells--Berryman, for example, said that he had to move his bed away from the wall to keep the cockroaches off--and according to the affidavit of one protective custody prisoner, "cockroaches are all over the trays ... we have to eat from." Berryman testified that in Five-Block, where the food trays were stacked in a cart that was pushed from cell to cell, "[t]here would be cockroaches crawling on the side of the trays...." Another prisoner's affidavit, in addition to mentioning mice and cockroaches, speaks of blackbirds, pigeons, and sparrows "flying wild in five block;" the record contains repeated references to bird droppings in eating areas and in the food itself. On one occasion Mr. Berryman is said to have been hit by a bird dropping while eating.
 
 
 24
 Most of the plastic trays on which food was served had cracks, according to Berryman, and he testified that the trays "would be filthy with caked on food from other meals...." Krupinski too said that the trays were caked with old food; he complained about this frequently, as did almost everybody on the block, and the prisoners sometimes emphasized their complaints (which allegedly met with derision from the guards) by throwing the trays over the rail, food and all.
 
 
 25
 Although paper inserts were sometimes put in the trays at the serving line in Seven-Block, Berryman said, he saw no paper inserts in Five-Block. The diary entires attributed to prisoner Crusore speak of food particles clinging to cracked and broken serving trays "as if they were glued on." Dirty trays and trays with cockroaches on them appeared almost daily, according to Berryman.
 
 
 26
 As to the cleaning of cells and pest control efforts there, Berryman testified that about once a week, in both Five-Block-East and in Seven-Block, he would receive a small broom, a bar of prison-made soap, and some toilet paper with which to clean his cell. He was permitted to sweep the front of his cell after each meal, and porters might mop down the gallery at the end of the day. Krupinski testified that despite his requests, no one ever sprayed his cell for cockroaches. Berryman too requested that his cell be sprayed, and this was done twice while he was in Seven-Block. Although he asked that his Five-Block cell be sprayed, it never was. The only spraying he saw in Five-Block was in the area where the officers took their own food. He said he saw catwalks in Seven-Block being sprayed two or three times, and Krupinski saw the catwalks in Five-Block being sprayed on occasion. Neither man ever say any traps or bait being set out for mice.
 
 
 27
 About the only evidence to support the plaintiffs' complaints concerning the adequacy of the heating system consisted of statements to the effect that it sometimes felt as if the temperature were in the fifties. Mr. Krupinski admitted that he never asked for additional blankets or clothing. Mr. Berryman said it was a little colder in Seven-Block than in Five-Block, "but over there [Seven-Block] you'd get somebody to get an extra blanket." Windows would sometimes be broken by the prisoners, but the record shows without contradiction, as far as we have been able to ascertain, that it was the practice of the prison authorities to seal the openings as soon as possible, using plywood or plastic when glass of the correct size was not available.
 
 
 28
 The affidavit of Richard Malson, the prison's chief engineer, explains that the prison complex was heated by hot water from the powerhouse. The temperature was regulated from the powerhouse, according to the affidavit, with a view to maintaining a wintertime temperature of approximately 68 degrees in the housing units. High winds could cool the water enough to lower the temperature in the housing units below the desired level, and Chief Engineer Malson said that the temperature at the powerhouse would then be increased to compensate for the weather conditions.[2]
 
 
 29
 As far as we can tell there was only one occasion during the relevant time period when the heating system actually broke down. The chief engineer's affidavit contains uncontradicted evidence that the system was repaired within 24 hours.
 
 
 30
 The Malson affidavit, a deposition of Deputy Warden Grant, and other affidavits and deposition testimony filed by the defendants in support of their summary judgment motion contradict some aspects of the plaintiffs' allegations with respect to pest control, but not their allegations respecting the consistent failure to clean the food trays. We shall not attempt to summarize the defendants' evidence here; where the presentations of the two sides cannot be harmonized, the paper record affords no basis for resolving the conflict. Defendant Johnson submitted no affidavit, it should be noted, and the record is completely silent as to his actual knowledge of or responsibility for the conditions complained of.
 
 
 31
 With this overview of the record, we turn to an analysis of the legal issues presented on appeal.
 
 II
 
 32
 After the district court entered its orders denying the defendants' summary judgment motion in part and denying the motion to alter or amend, the defendants filed a notice of appeal the body of which began as follows: "Notice is hereby given that Defendants hereby appeal to the United States Court of Appeals for the Sixth Circuit...." (Emphasis supplied.) The body of the notice did not name any individual defendant, but the caption of the document set forth the title of the action as "PHILIP WAYNE BERRYMAN and CHESTER JOSEPH KRUPINSKI, Plaintiffs, v. PERRY M. JOHNSON, ET AL, Defendants."
 
 
 33
 Rule 3(c), Fed.R.App.P., makes it mandatory that a notice of appeal specify the party or parties taking the appeal. This requirement presents a jurisdictional bar to the appeal of any party who, though he may have wished to appeal, has not been specified as an appellant in the notice of appeal. Torres v. Oakland Scavenger Co., 487 U.S. 312 (1988).
 
 
 34
 Minority Employees of the Tennessee Department of Employment Security, Inc. v. Tennessee Department of Employment Security, 901 F.2d 1327 (6th Cir.1990) (en banc), cert. denied, 110 S.Ct. 210 (1990), was a case in which there were four plaintiffs, all of whom sought to appeal. The body of their notice of appeal did not recite the names of the plaintiffs; in specifying the parties taking the appeal, it simply used the designation "plaintiffs in the above case." We held that this designation did not give fair notice that anyone other than the lead plaintiff--whose name appeared in the caption, followed by the words "et al."--was taking an appeal. Insofar as the appeal purported to include the remaining three plaintiffs, it was dismissed for want of jurisdiction.
 
 
 35
 Minority Employees obviously governs here.[3] If the words "plaintiffs in the above case" could not fairly be read as signifying all of the plaintiffs in Minority Employees, the word "Defendants" cannot fairly be read as signifying all of the defendants in the case at bar. The notice of appeal is effective as to Perry M. Johnson, whose name appears in the caption, but is not effective as to any other defendant.
 
 III
 
 36
 Under the terms of the Eleventh Amendment, the judicial power conferred by Article III of the United States Constitution may not be construed to extend to lawsuits brought "against one of the United States by Citizens of another State...." The Eleventh Amendment does not expressly address the matter of suits against a state by its own citizens--and we presume that the plaintiffs in the case at bar are citizens of Michigan--but in a line of cases stretching back to Hans v. Louisiana, 134 U.S. 1 (1890), the Supreme Court has discerned in the Eleventh Amendment an "affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art III" regardless of the citizenship of the plaintiff. Pennhurst State School & Hospital v. Halderman, 465 U.S. 89, 98 (1984); cf. Blatchford v. Native Village of Noatok, 59 U.S.L.W. 4803 (June 24, 1991), --- S.Ct. ---- (1991).
 
 
 37
 The plaintiffs in the present case did not use the State of Michigan by name. In bringing a damage action against defendant Johnson in his "official capacity," however, they sought a judgment for which the state treasury would be responsible--and such a lawsuit is "no different from a suit against the State itself." Will v. Michigan Department of State Police, 491 U.S. 58, 71 (1989), citing Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). Except where Congress has explicitly exercised its power to abrogate state sovereign immunity,[4] or where the state itself has consented to suit, the jurisdiction of the federal courts simply does not extend to state defendants. See Cowan v. University of Louisville School of Medicine, 900 F.2d 936, 940 (6th Cir.1990), and the cases there cited.
 
 
 38
 The defendants in the instant case, it will be recalled, were sued both in their official capacities and in their individual capacities. The plaintiffs' amended complaint also alleges that the defendants were acting under color of law. "Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law," and "an award of damages against an official in his personal capacity can be executed only against the official's personal assets...." Kentucky v. Graham, 473 U.S. 159, 165-66 (1985). The sovereign immunity doctrine does not bar actions for money damages against state officials who are sued in their personal (i.e. individual) capacities. Scheuer v. Rhodes, 416 U.S. 232, 237-38 (1974); Foulks v. Ohio Department of Rehabilitation and Correction, 713 F.2d 1229, 1233 (6th Cir.1983); Spruytte v. Walters, 753 F.2d 498, 511-12 (6th Cir.1985), cert. denied, 475 U.S. 1054 (1986).
 
 
 39
 Where a complaint seeking damages against a state official for misconduct in office fails to specify the capacity in which the official is being sued, we treat the action as one brought against the official's office, and thus against the state itself; such actions are subject to dismissal for want of jurisdiction. Wells v. Brown, 891 F.2d 591, 592 (6th Cir.1989). Federal courts do have jurisdiction, however, insofar as plaintiffs seeking damages under 42 U.S.C. Sec. 1983 "set forth clearly in their pleading that they are suing the state defendants in their individual capacity for damages, not simply in their capacity as state officials." Id.
 
 
 40
 In the argument they presented before the district court in this case, the defendants maintained that "the state is the real, substantial party in interest," Ford Motor Co. v. Department of Treasury, 323 U.S. 459, 464 (1945); they went on to suggest that under Pennhurst, the case must therefore be dismissed in its entirety. Some support for this argument might be found in Cowan, 900 F.2d at 942, where we expressed reluctance to let "a mere pleading device" be used to circumvent the intent of Congress that states not be sued under 42 U.S.C. Sec. 1983.[5] Declaring in Cowan that we saw "no evidence whatsoever" that two state university officials sued in their individual capacities "were acting in anything other than their official capacities" in dismissing the plaintiff from the university's medical school, we declined to engage in a review of the plaintiff's due process claim against the officials. Id. See also Bender v. Williamsport Area School District,5i 475 U.S. 534 (1986), where the first paragraph of a complaint against certain school officials said that the action was being brought against the defendants "in their individual and official capacities," but a later paragraph indicated that a defendant who subsequently sought to appeal a declaratory judgment was being sued as a member of the school board. While acknowledging the presence of the "individual and official capacities" language in the first paragraph of the complaint, the Supreme Court noted that "[t]here is ... nothing else in the complaint, or in the record on which the District Court's judgment was based, to support the suggestion that relief was sought against any School Board member in his or her individual capacity." Id. at 543 (emphasis in original). Accordingly, and because the Supreme Court concluded that the declaratory judgment had not been entered against the school board member in his individual capacity, the Court held that he had no standing to appeal in that capacity.
 
 
 41
 Notwithstanding Cowan and Bender, our recent opinion in Ritchie v. Wickstrom, No. 90-2280 (6th Cir. July 23, 1991), --- F.2d ---- (6th Cir.1991), demonstrates clearly, we believe, that insofar as the complaint in the case at bar purports to be brought against defendant Johnson in his individual capacity, it is not subject to dismissal on Eleventh Amendment grounds. In Ritchie, a prison inmate brought a Sec. 1983 action against individual officials named Wickstrom and Koehler. Unlike the plaintiff in Bender, the Ritchie plaintiff sought money damages. Stating that "Cowan does not stand for the proposition that every time a state official is charged with misconduct while acting within the general ambit of his job title eleventh amendment immunity comes into play," we held in Ritchie that
 
 
 42
 "the suit against corrections officer Wickstrom is an 'individual capacity' suit not subject to eleventh amendment protections. Similarly, we believe the suit against Koehler is an 'individual capacity' suit, notwithstanding that no 'hands on' misconduct is claimed. Koehler is sued as the policy maker for the institution. See, e.g., Pembaur v. City of Cincinnati, 475 U.S. 469 (1986). A judgment against Koehler would not be a judgment against the State, and the State would not be compelled to reimburse Koehler or pay the judgment. If the State should voluntarily pay the judgment or commit itself to pay as a result of a negotiated collective bargaining agreement, this would not change the analysis. We thus reverse the decision to dismiss on eleventh amendment grounds.' " Id. at 7 (footnote omitted, emphasis in original).
 
 
 43
 Ritchie's gloss on Cowan is highly authoritative, the same judge having written both opinions.
 
 
 44
 The holding in Ritchie controls our holding here. Defendant Johnson is presumably being sued as the policy-maker for the State Prison of Southern Michigan. (Whether Mr. Johnson actually had anything to do with the matters of which the plaintiffs complain remains to be seen, of course.) Insofar as this defendant has been sued in his individual capacity, a judgment against him could not be enforced against the State of Michigan. Insofar as he has been sued in his official capacity, however, the action against him should have been dismissed on Eleventh Amendment grounds. Ford Motor Co., 323 U.S. at 462; Pennhurst, 465 U.S. at 101-03.
 
 IV
 
 45
 Before we reach the question of Mr. Johnson's right to qualified immunity, it will be convenient to address the merits of those claims--food, sanitation, and heating--on which the district court withheld summary judgment, thereby exposing Mr. Johnson to a continuing burden of litigation.
 
 
 46
 As we have indicated, the food, sanitation and heating claims represent only part of the total picture complained of. The amended complaint alleges that "[t]he totality of the living conditions which Plaintiffs were forced to endure in 5 and 7 blocks was ... degrading, humiliating and unfit for human habitation." By knowingly allowing this totality of conditions to remain, the complaint alleges, the defendants not only violated the cruel and unusual punishments provision of the Eighth Amendment, as made applicable to the states through the Due Process Clause of the Fourteenth Amendment, they also violated the plaintiffs' "substantive due process rights."
 
 
 47
 The "substantive due process" claim was ignored by the district court, and properly so. The Fourteenth Amendment does have a substantive aspect, the Supreme Court has told us, but "the Eighth Amendment, which is specifically concerned with the unnecessary and wanton infliction of pain in penal institutions, serves as the primary source of substantive protection to convicted prisoners...." Whitley v. Albers, 475 U.S. 312, 327 (1986). In the face of a constitutional commandment that plainly says "Thou shalt not inflict cruel and unusual punishments," our respect for the text of the Constitution ought to make us cautious about applying a commandment that says "Thou shalt not deprive any person of life, liberty or property without due process of law." See McDowell v. Rogers, 863 F.2d 1302, 1306 (6th Cir.1988), using similar reasoning in a Fourth Amendment context, and Graham v. Connor, 490 U.S. 386, 395 (1989), adopting the same view. As far as claims that lend themselves to analysis under the Eighth Amendment are concerned, we have squarely held that the claimant's Sec. 1983 action "must be for redress of eighth amendment, not fourteenth amendment substantive due process, rights." Walker v. Norris, 917 F.2d 1449, 1455 (6th Cir.1990).
 
 
 48
 We have likewise rejected the notion--endorsed by the magistrate in this case, but not by Judge Gilmore--that claims of Eighth Amendment violations are to be determined by what the magistrate called "the totality of the conditions of confinement standard." See Walker v. Mintzes, 771 F.2d 920, 926 (6th Cir.1985), where we quoted with approval the following language from Hoptowit v. Ray, 682 F.2d 1237, 1246-47 (9th Cir.1982):
 
 
 49
 "Courts may not find Eighth Amendment violations based on the 'totality of conditions' at a prison. There is no Eighth Amendment violation if each of these basic needs [food, clothing, shelter, sanitation, medical care, and personal safety] is separately met.... A number of conditions, each of which satisfy Eighth Amendment requirements, cannot in combination amount to an Eighth Amendment violation."
 
 
 50
 A somewhat more precise analysis was given in the paragraph of Walker v. Mintzes that preceded the quotation from Hoptowit v. Ray:
 
 
 51
 "In certain extreme circumstances the totality itself may amount to an eighth amendment violation, but there still must exist a specific condition on which to base the eighth amendment claim. We believe such conditions 'considered alone or in combination [with other conditions],' Rhodes [v. Chapman], 452 U.S. at 347, 101 S.Ct. at 2399, must amount to a deprivation of 'life's necessities,' id., before a violation of the eighth amendment can be found." 771 F.2d at 925.
 
 
 52
 The Supreme Court's recent opinion in Wilson v. Seiter, 59 U.S.L.W. 4671, 4673 (June 17, 1991), --- S.Ct. ----, ---- (1991), which is entirely consistent with Walker v. Mintzes, says this on the subject;
 
 
 53
 "Some conditions of confinement may establish an Eighth Amendment violation 'in combination' when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise--for example, a low cell temperature at night combined with a failure to issue blankets.... To say that some prison conditions may interact in this fashion is a far cry from saying that all prison conditions are a seamless web for Eighth Amendment purposes. Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." (Emphasis in original.)
 
 
 54
 Wilson v. Seiter not only holds that a specific deprivation of one or more identifiable human needs must be established in order to prove an Eighth Amendment violation, but it also holds that the plaintiff must show "a culpable state of mind on the part of [the defendant] prison officials...." Id. at 4671. Liability cannot be predicated on mere negligence; the plaintiff must, at a minimum, show "deliberate indifference," the rubric coined by the court in Estelle v. Gamble, 429 U.S. 97, 104 (1976)--and whether the defendant official has bene guilty of "deliberate indifference" or more serious "wantonness" of conduct can depend upon the constraints facing the official, regardless of the effect of the conditions in question upon the prisoner. Wilson, 59 U.S.L.W. at 4672.
 
 
 55
 It is thus settled that Eighth Amendment claims based on prison conditions have both an objective component (denial of what Rhodes v. Chapman, 452 U.S. 337, 347 (1981), called "the minimal civilized measure of life's necessities"), and a subjective component ("deliberate indifference," e.g.). In the case at bar, at least as far as defendant Johnson is concerned, the defendants' motion for summary judgment did not address the subjective component at all. There was, to repeat, no affidavit from Mr. Johnson. No suggestion was made, at the district court level, of the absence of a material issue of fact regarding Mr. Johnson's state of mind--and the plaintiffs not having been put to their proof on this matter, it was not incumbent upon them to show what Mr. Johnson's state of mind actually was.[6] The parties did, however, attempt to address the objective component of the plaintiffs' claims, and we consider that matter next.
 
 
 56
 The plaintiffs' food and sanitation claims deal primarily with a single problem: unsanitary food and unsanitary eating conditions caused by birds, mice, cockroaches, and totally inadequate dish washing. We have no doubt that "life's necessities" include food that does not subject one to serious risk of illness. The plaintiffs in this case do not contend that the conditions of which they complain ever made them sick--a circumstance that will be highly relevant in any assessment of their claims by a trier of fact--but viewing the evidence (which we examine de novo) in the light most favorable to the plaintiffs, as we must at the summary judgment stage, we agree with the district court that the plaintiffs' showing was sufficient to defeat the motion for summary judgment. We must assume, for present purposes, that the plaintiffs' food was regularly exposed to cockroaches, mice, and birds, and that the plaintiffs normally had to eat it from cracked and dirty trays that were caked with old food. There has been no showing of how the trays were washed or whether they were sterilized, just as there has been no attempt to show that cockroaches and the like posed no serious threat to health or that more extensive pest control efforts would have been impracticable.[7]
 
 
 57
 We think the district court erred, however, in withholding summary judgment on the plaintiffs' claim of inadequate heating. It is clear, of course, that life's necessities include the means of keeping reasonably warm in the wintertime. This is particularly important in a place like Michigan, where inadequate protection from the winter cold can result in death. But the record in this case, as we read it, simply does not indicate that the plaintiffs can prove an Eighth Amendment violation insofar as warmth in the wintertime is concerned.
 
 
 58
 The plaintiff inmate in Wilson v. Seiter, as the Supreme Court noted with obvious approval, acknowledged that "if a prison boiler malfunctions accidentally during a cold winter, an inmate would have no basis for an Eighth Amendment claim, even if he suffers objectively significant harm." 59 U.S.L.W. at 4672. In the instant case the prison boiler was not shown to have malfunctioned more than once; the malfunction caused no objectively significant harm, and it was repaired within 24 hours.
 
 
 59
 The prisoners' breaking of windows in the wintertime can be likened to the accidental malfunctioning of the boiler. The window-breaking may have lowered the temperature, but again there was no objectively significant harm, and again (as the defendants' evidence shows without contradiction) repairs were made promptly.
 
 
 60
 The temperature could also be lowered when the pipes carrying hot water to Five-Block and Seven-Block were subjected to unusually high winds. The affidavit of Mr. Malson, the prison's chief engineer, says that boiler room temperatures were raised to compensate for this phenomenon when it occurred, and the record contains no refutation of this evidence. There is a conflict as to how cold the cells actually got, but the plaintiffs themselves do not contend that the temperature dropped below the fifties. Noting that plaintiff Krupinski was around 30 years old and plaintiff Berryman around 35, we reject the notion that healthy men of these ages, both of whom admittedly had blankets, could not be expected to withstand periodic exposure to temperatures in the fifties.
 
 V
 
 61
 If the plaintiffs had an otherwise viable Eighth Amendment claim against defendant Johnson based on food/sanitation conditions, the claim ought still to have been dismissed if defendant Johnson was entitled to qualified immunity.
 
 
 62
 The plaintiffs argue that qualified immunity is an affirmative defense that was waived, in this case, because the defendants failed to plead it in their answer to the first amended complaint. We do not find the argument meritorious.
 
 
 63
 The defendants' answer to the plaintiffs' original complaint set forth as affirmative defenses not only that liability was barred by the Eleventh Amendment, but also that the defendants had "conducted themselves in good faith in accordance with Department of Corrections policy and are not subject to monitory [sic] damages." Qualified immunity was commonly referred to as "good faith" immunity when this pleading was filed in 1981, and the pleading was adequate to put the plaintiffs on notice of the qualified immunity defense.
 
 
 64
 It is true that when the defendants first answered the amended complaint which the plaintiffs filed more than five years later, the qualified immunity defense was omitted. Three months after the amended complaint was answered, however, the defendants moved for leave to file an amended answer. The motion explained that "[c]ounsel for Defendants inadvertently forgot to include affirmative defenses of [inter al.] qualified immunity from damages...." An amended answer setting forth a qualified immunity defense was tendered with the motion. Although the court did not enter an order formally granting the motion, the amended answer was accepted for filing. An entry reflecting this fact was made in the docket. Given the measured pace at which the case was progressing, the fact that the plaintiffs had long been on notice of the qualified immunity defense, and the mandate of Rule 15(a), Fed.R.Civ.P., which says that leave to amend "shall be freely given when justice so requires," it is inconceivable that the defendants' motion for leave to file the amended answer could have been denied. Both the magistrate and the district court addressed the qualified immunity defense on the merits, and we shall do likewise.
 
 
 65
 The landmark case of Harlow v. Fitzgerald, 457 U.S. 800 (1982), teaches that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Id. at 818. The courts have frequently allowed prison officials to use the shield of qualified immunity against actions asserting Eighth Amendment claims under 42 U.S.C. Sec. 1983--see, e.g., Marsh v. Arn, Nos. 89-3415/3449, slip op. at 19-23 (6th Cir. June 25, 1991), --- F.2d ----, ---- (6th Cir.1990), and cases there cited--and where we have rejected claims of qualified immunity, we have stressed that the shield may only be pierced if, at the time of the conduct complained of, " '[t]he right the official is alleged to have violated [was] "clearly established" ' in a particularized sense...." Haynes v. Marshall, 887 F.2d 700, 703 (6th Cir.1989), quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987). "[O]therwise," as we noted in Haynes, " '[p]laintiffs would be able to convert the rule of qualified immunity ... into a rule of virtually unqualified liability simply by alleging violation of extremely abstract rights.' " Id., again quoting Anderson, 483 U.S. at 639. If the controlling law is not clearly established in a particularized sense, "a reasonable person would not be expected to know how to structure his conduct in order to avoid liability." Todd v. United States, 849 F.2d 365, 368-69 (9th Cir.1988). "Simply put, while official action is not necessarily protected by qualified immunity unless and until the very action in question has been held unlawful, [Anderson, 483 U.S. at 640], the unlawfulness must be apparent in light of pre-existing law." Marsh, slip op. at 19, --- F.2d at ----, citing Malley v. Briggs, 475 U.S. 335, 344-45 (1986).
 
 
 66
 In a generalized sense, at least, the rights that the plaintiffs seek to vindicate had been clearly established well before the time period (1979-81) with which we are concerned in this case. As early as 1971 the Supreme Court recognized that prisoners confined in maximum security at the Missouri State Penitentiary were entitled to challenge the constitutionality of their living conditions under 42 U.S.C. Sec. 1983. Wilwording v. Swenson, 404 U.S. 249 (1971). Three months later, in Jones v. Metzger, 456 F.2d 854 (6th Cir.1972), our court held that prisoners confined in a county jail under conditions alleged to be "impermissibly archaic and oppressive" could bring suit in federal court under 42 U.S.C. Sec. 1983 to challenge the constitutionality of such conditions. While recognizing that federal courts "should be reluctant to become involved in the internal administration of state prisons," we held that the plaintiffs were not required to exhaust their state remedies before bringing suit in federal court. Id. at 855-86.
 
 
 67
 A more particularized description of prisoners' Eighth Amendment rights was provided by the Supreme Court in 1976, with the issuance of the decision in Estelle v. Gamble, 429 U.S. 97 (1976). The Court held there that a state government was obligated to provide necessary medical care for its prisoners, and that "deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain' ... proscribed by the Eighth Amendment." Id. at 104, quoting Gregg v. Georgia, 428 U.S. 153 (1976). The Court observed in Estelle v. Gamble that the Eighth Amendment
 
 
 68
 "embodies 'broad and idealistic concepts of dignity, civilized standards, humanity, and decency ...,' Jackson v. Bishop, 404 F.2d 571, 579 (CA8 1968), against which we must evaluate penal measures. Thus, we have held repugnant to the Eighth Amendment punishments which are incompatible with 'the evolving standards of decency that mark the progress of a maturing society'...." Id. at 102, quoting Trop v. Dulles, 356 U.S. 86, 101 (1958).
 
 
 69
 In Hutto v. Finney, 437 U.S. 678 (1978), the Supreme Court gave a reasonably clear signal that the need of prisoners for proper food is entitled to no less protection than their serious medical needs. The Hutto opinion describes an Arkansas penal system that makes SPSM look very good indeed by comparison. Arkansas prisoners subjected to confinement in punitive isolation would be crammed into small windowless cells in groups as large as 10 or 11. There they were fed meals "consist[ing] primarily of 4-inch squares of 'grue,' a substance created by mashing meat, potatoes, oleo, syrup, vegetables, eggs, and seasoning into a paste and baking the mixture in a pan." Id. at 683. This diet provided less than 1000 calories a day, about half the calories said to be burned by a mature man spending 12 hours a day lying down and 12 hours sitting or standing. Practically all inmates lost weight on the "grue" diet, and the district court had, among other things, ordered that the diet be discontinued. The Supreme Court found no error in the affirmance of this order by the court of appeals.
 
 
 70
 It is somewhat difficult for defendant Johnson to argue that the pre-1979 case law did not clearly foreshadow judicial acceptance of the proposition that the Eighth Amendment can be violated by subjecting a prisoner to dietary conditions likely to be injurious to his health. In November of 1977 Mr. Johnson himself sent a memorandum to all department of corrections employees transmitting a set of administrative rules that had been more than three years in the making. The rules were accompanied by a "commentary" which Mr. Johnson characterized as "an essential tool for explaining the basis and purpose of the legal requirements." One of the "legal requirements," embodied in Rule 791.6641, was that a resident be housed in "[c]lean and orderly surroundings" with "[a] wholesome and nutritionally adequate diet." The accompanying commentary contained the following explanation, from which we omit a paragraph that gave supporting legal citations:[8]
 
 
 71
 "This rule embodies the holdings of numerous cases that have found the physical conditions of confinement in both jails and prisons to be unconstitutional. The scope of the Eighth Amendment's protection against cruel and unusual punishment is broadening into a declaration of a 'right to a decent prison environment' [Recent Developments in Correctional Case Law 57].
 
 
 72
 In examining the cell size, adequacy of lighting, heating, diet, hygiene and exercise facilities, the courts are primarily concerned with the health of the inmate. Thus, it is the degree of deprivation occasioned by a particular facility that is important. At some point one or a combination of conditions may become so terrible as to amount to cruel and unusual punishment."
 
 
 73
 Whether the food/sanitation conditions experienced by the plaintiffs in this case were in fact "so terrible as to amount to cruel and unusual punishment" remains to be seen, and we confess to considerable skepticism on this score. It seems to us, however, that a reasonable prison official could have had no real doubt, even before the Supreme Court's comprehensive prison conditions opinion in Rhodes v. Chapman, 452 U.S. 337 (1981), that deliberate indifference to a need as basic as that for reasonably hygienic food could be actionable under 42 U.S.C. Sec. 1983. This conclusion does not rest on "a mere handful of [admittedly novel] decisions of other circuit and district courts," Ohio Civil Service Employees Ass'n v. Seiter, 858 F.2d 1171, 1177 (6th Cir.1988); it rests on decisions of the Supreme Court and a substantial body of lower court authority which clearly indicated, as the commentary endorsed by Mr. Johnson said it did, that "the courts are primarily concerned with the health of the inmate."
 
 VI
 
 74
 Although the district court has yet to dispose of this case in its entirety, the court's denial of the defendants' qualified immunity claim represented a final decision on a collateral issue the disposition of which would be effectively unreviewable on appeal from a final judgment. To the extent that it turned on an issue of law, therefore, the order denying qualified immunity was a "final decision" appealable under 28 U.S.C. Sec. 1291 notwithstanding the absence of a final judgment. Mitchell v. Forsyth, 472 U.S. 511, 525-29 (1985).
 
 
 75
 The fact that the denial of the defendants' qualified immunity claim could be appealed forthwith does not necessarily mean that the plaintiffs could immediately appeal the partial summary judgment entered against them on their out-of-cell exercise claim. Recognizing that, as they told the district court, "Mitchell v. Forsyth ... does not address the issue of whether Plaintiffs have a right to cross-appeal if Defendants appeal the qualified immunity decision," the plaintiffs filed a motion asking the district court to enter an order permitting an interlocutory appeal under Rule 54, Fed.R.Civ.P., and 28 U.S.C. Sec. 1292. The district court appears to have taken no action on this motion.
 
 
 76
 The entry of partial summary judgment against the plaintiffs on their exercise claim does not itself meet the requirements for an appeal under the collateral order doctrine. That being so, some of our caselaw suggests that we should decline to exercise appellate jurisdiction going beyond a review of the denial of qualified immunity. See Huron Valley Hospital, Inc. v. City of Pontiac, 792 F.2d 563 (6th Cir.) (appeal on denial of qualified immunity did not carry with it a right to appeal denial of antitrust immunity claim based on "state action"), cert. denied, 479 U.S. 885 (1986); Dominque v. Telb, 831 F.2d 673 (6th Cir.1987) (questions regarding the propriety of a civil rights action challenging the validity of incarceration were not addressed on appeal of the denial of qualified immunity, such appeals being "limited" in nature). In other cases involving appeals from the denial of qualified immunity claims, however, we have not confined our review to the viability of the qualified immunity defense. See Carlson v. Conklin, 813 F.2d 769, 770-71 (6th Cir.1987); Foster v. Walsh, 864 F.2d 416, 418 (6th Cir.1988).
 
 
 77
 In Carlson, where defendant Perry M. Johnson was also a party and where he also appealed from a denial of qualified immunity, we held (just as we hold in the instant case as far as the plaintiffs' heating claim is concerned) that the claim against Mr. Johnson failed on its merits. It was therefore not necessary for us to reach the qualified immunity defense in Carlson. In Foster, similarly, where two defendants had appealed pursuant to Mitchell v. Forsyth, we held that one defendant had absolute judicial immunity and that the complaint failed to state a cause of action against the other defendant. The case was dismissed in its entirety on that basis.
 
 
 78
 The situation presented here is different. The food/sanitation claims against Mr. Johnson remain to be litigated, and this would be true regardless of how we might rule on the plaintiffs' cross-appeal. We have no way of knowing what the future course of the litigation will be, and it is entirely possible that the case can be finally disposed of without a decision from us as to whether it was wrong for the district court to grant summary judgment in favor of Mr. Johnson on the out-of-cell exercise matter. Accordingly, we think it the better course not to accept jurisdiction over the cross-appeal. If the plaintiffs ultimately appeal from a final judgment in this case, they can raise the exercise issue then.
 
 
 79
 The order of the district court is AFFIRMED in part and REVERSED in part, and the case is REMANDED for further proceedings not inconsistent with this opinion.
 
 
 
 [1]
 The unverified and unauthenticated hearsay evidence attributed to Mr. Crusore was clearly objectionable. We can find nothing in the record to support the plaintiffs' contention that it comes within the business records exception to the hearsay rule. The magistrate to whom the case was assigned denied a motion to strike this material, however, and the defendants failed to appeal the magistrate's ruling
 
 
 [2]
 The chief engineer's affidavit also contains a detailed explanation of how he and his staff dealt with plumbing problems in the cellblocks. We find no indication in the record that toilet and plumbing facilities in Five-Block and Seven-Block were inadequate, and such matters do not appear to be included in the plaintiffs' claim of an overall lack of sanitation
 
 
 [3]
 Two members of the present panel dissented in Minority Employees, but this panel cannot overrule a published opinion of a previous three-judge panel, much less a published opinion of the full court. See Court Policies-Sixth Cir., Sec. 10.2 (June 12, 1991)
 
 
 [4]
 Section 5 of the Fourteenth Amendment gives Congress the power to enforce the provisions of the amendment by "appropriate legislation." It is clear that Congress can abrogate state sovereign immunity pursuant to this section, see Welch v. State Department of Highways and Public Transportation, 483 U.S. 468, 474 (1987), but it is equally clear that 42 U.S.C. Sec. 1983, the statute under which the plaintiffs have sued here, was not designed to accomplish such a result. Quern v. Jordan, 440 U.S. 332, 341 (1979). See generally Kelley v. Metropolitan County Board of Education of Nashville and Davidson County, 836 F.2d 986, 989 (6th Cir.1987), cert. denied, 487 U.S. 1206 (1988)
 
 
 [5]
 The quoted language comes from Will, 491 U.S. at 71, as quoted in Rice v. Ohio Department of Transportation, 887 F.2d 716, 719 (6th Cir.1989), vacated on other grounds, 110 S.Ct. 3232 (1990)
 
 
 [6]
 If this case is not settled or otherwise disposed of short of trial, of course, the plaintiffs will ultimately have to show what Mr. Johnson actually knew or should have known about the conditions complained of, and what his responsibilities actually were. The plaintiffs' burden will be a heavy one; common gripes about the cleanliness of prison dining areas hardly show cruel and unusual punishment, see Burrascano v. Levi, 452 F.Supp. 1066, 1068 (D.Md.1978), aff'd without published opinion, 612 F.2d 1306 (4th Cir.1979), and the head of the corrections department can hardly be held personally liable for every dirty serving tray and every swarm of cockroaches
 
 
 [7]
 The defendants have not argued as a matter of law that proof of some physical injury would be necessary to support a recovery of damages; without deciding this issue one way or the other, we shall assume, for purposes of this opinion only, that no such proof is necessary
 
 
 [8]
 One of the citations was to our decision in Jones v. Metzger, 456 F.2d 854, supra